WILLIAMS, J.
The defendant, Mark Edward Colby, was charged by bill of indictment with second degree murder, in violation of La. R.S. 14:30.1. Following a jury trial, he was found guilty as charged. He was sentenced to life imprisonment without the benefit of parole, probation or suspension of sentence. For the following reasons, we affirm.
FACTS
On September 10, 2014, the Shreveport Police Department ("SPD") responded to a report of a deceased person at a residence. The police officers arrived at the home of the victim, 53-year-old Angela Godley, and discovered that she had been shot multiple times. The officers also learned that Godley shared the house with the defendant, Mark Edward Colby, with whom she was involved in a romantic relationship.
The subsequent investigation revealed that Godley owned and operated a restaurant and bar in Shreveport known as the Noble Savage Tavern ("the tavern"). During interviews with employees of the tavern, the officers learned the following facts: Godley and the defendant were last seen having drinks together at the tavern on September 10, 2014, at approximately 1:30 a.m.; the tavern was registered in Godley's name because the defendant's "criminal history" prevented him from obtaining a liquor license; and the defendant carried a handgun.
The defendant became a person of interest early in the investigation into Godley's murder. However, initially, the SPD was unable to locate the defendant or ascertain his whereabouts. On September 12, 2014, the defendant was apprehended in Mexico. Subsequently, he was transported to Shreveport and was later indicted by a grand jury for second degree murder, in violation of La. R.S. 14:30.1.
On June 13, 2016, the state filed a notice of intent to introduce evidence of other *1266 crimes, wrongs or acts, pursuant to La. C.E. art. 404(B). The state's Prieur[1] notice identified four "other crimes, wrongs, or acts" as follows:
1. January 25, 2011: Godley called the police to the home she shared with the defendant. Godley reported that the defendant had held a knife to her throat and threatened to kill her. The defendant was arrested and charged with domestic abuse battery.
2. November 8, 2006: Robert Brocato, a patron of the tavern, contacted the SPD and reported that the defendant had put a handgun to the left side of Brocato's head and fired one shot into the air. The defendant was arrested and charged with illegal use of a weapon.
3. November 30, 2004: Summer Bailey, a former employee of the tavern, contacted the SPD and reported that the defendant had pulled a handgun on her, fired one shot in the floor near her feet, grabbed her by her neck, lifted her off the floor and "slammed" her into a brick wall several times.
4. May 10, 2012: The defendant left a handgun at a local gym. The gun was handed over to the SPD. Thereafter, the defendant claimed the weapon from the SPD. The gun was identified as the weapon used to murder Godley.
In the Prieur notice, the state maintained that the evidence was relevant to prove the following:
[T]he defendant's intent to kill or inflict great bodily harm on the victim; the defendant's planning and preparation of the murder; the defendant's identity as the murderer; the defendant's motive for the murder; the absence of mistake or accident; and/or modus operandi.
On July 19, 2016, the defendant filed an opposition to the Prieur notice, arguing that the information contained therein did not fall within the narrow exceptions of La. C.E. art. 404(B) and that the admission of the evidence would result in unnecessary prejudice. Following a hearing, the trial court found that all putative evidence offered by the state was admissible.[2]
Thereafter, a trial was held, at which multiple witnesses testified. Peter Fetterman, an employee at the tavern, testified as follows: he was working the night of September 9, 2014; when he left the tavern between 12:00 a.m. and 1:00 a.m., Godley was there drinking wine and vodka; and Godley and the defendant seemed to be "in good spirits" when he last saw them.
Michelle G. Ballard, who was also employed at the tavern, testified as follows: she was working at the tavern on the evening of September 9, 2014; Godley and the defendant were at the tavern "having drinks" that night; Godley was drinking wine and/or vodka and cranberry juice; she (Ballard) left the tavern at approximately 11:00 p.m.; Godley and the defendant seemed to be "in good spirits" when she left the tavern; she (Ballard) reported to work at the tavern on September 10, 2014, at approximately 2:30 p.m.; when she arrived, the doors were locked; she thought it unusual that the doors were locked because, ordinarily, the defendant would be at the tavern by the time she arrived to begin her shift; she noticed that Godley's vehicle was in the tavern's parking lot; she was unable to locate either Godley or the defendant by telephone; her concern motivated *1267 her to drive to the home Godley shared with the defendant; when she arrived at the house, she noticed that the garage door was open and she heard the couple's dogs barking; she walked into the garage, looked through the glass window of a door leading from the garage into the laundry room of the house, and saw Godley lying face down on the floor; one of the dogs was lying on top of Godley; she opened the unlocked door and called out to Godley, who did not respond; she noticed that Godley was wearing the same clothing she had been wearing the previous night; and she ran out of the house and called 911.
Detective Marcus Mitchell, a crime scene investigator with the SPD, testified as follows: he assisted in the investigation of Godley's murder; when he arrived at the residence, Godley's body had not been moved; he did not find any weapons in Godley's hands, on her person or within her reach; after obtaining a search warrant for the residence, he and other officers searched the house; during the search, the officers found multiple spent .45 caliber Hornady brand shell casings; a semi-automatic Colt Defender .45 caliber handgun, serial number DR31076 ("the Colt .45"), was found on a bed in one of the bedrooms; he removed the magazine from the gun and noticed that it was loaded with Hornady brand .45 caliber bullets; he located multiple revolvers throughout the house; when he arrived at the house, he documented and photographed the location of each gun and photographed the crime scene;[3] a flip-flop shoe that matched the one Godley was wearing was found in the kitchen near the laundry room; blood was spattered on the kitchen wall near the shoe; a bullet hole was found in a wall in the kitchen, and the bullet was found on the opposite wall; the blood spatter and bullet hole indicated that someone was shot in close proximity to the wall; the home had an "open" floor plan; a partial wall, containing a double-sided fireplace, was located between the living room area and the kitchen; multiple .45 caliber shell casings were found near the fireplace; the location of the shell casings indicate that shots were fired from that location; unlike a revolver, a semi-automatic handgun ejects shell casings when fired; a deformed bullet and more shell casings were found in the doorway leading into the laundry room; the deformity indicates that the bullet had been fired from a gun and had struck an object; another shell casing was found near Godley's body in the laundry room; he found Godley's handbag on a table in the dining room area; he did not find a gun in the handbag; he found multiple revolvers in the living room and kitchen, and one loaded revolver was found in a drawer in the laundry room several feet from Godley's body;[4] he "bagged" and labeled the Colt .45; and he suspected that the Colt .45 could be the murder weapon because it was the only semi-automatic weapon found in the house.[5]
*1268 Detective Chad Dailey, a detective with the violent crimes section of the SPD, also assisted in the investigation of Godley's murder. Det. Dailey testified as follows: when he arrived at the crime scene, he learned that the defendant lived in the house with Godley; he became concerned that the defendant may have also been a victim of the crime; after interviewing Ballard, he sent police officers to the tavern to secure the location and to determine if there were any other victims of the homicide; multiple guns were recovered from the tavern; during his interview with some of the tavern's employees, Eric Johnson, one of the managers, informed him that the defendant had stated to him (Johnson) that he (the defendant) would flee to Mexico if he was ever charged with a crime;[6] he (Det. Dailey) issued a request to locate the defendant's Ford Ranger truck and provided the truck's license plate number; Louisiana highway traffic cameras identified the defendant's truck on I-49 South at 6:00 a.m. and on I-10 westbound in Lake Charles, Louisiana, at 10:00 a.m. on September 10, 2014; he was later informed by the Department of Homeland Security that the defendant's truck was identified traveling from Laredo, Texas, into Juarez, Mexico at 4:31 p.m. on September 10, 2014; after he received photographs from the Department of Homeland Security depicting the defendant driving his truck across the border into Mexico, he obtained a warrant to arrest the defendant for Godley's murder;[7] with assistance from the Department of Homeland Security, the defendant was located, arrested, escorted to the border and turned over to United States authorities;[8] he, Det. Mitchell and another SPD detective traveled to Del Rio, Texas, to interview the defendant;[9] during the interview, the defendant, with a seemingly nonchalant demeanor, spoke about how "well" he had been treated by Mexican authorities and complimented the food he had been served during his detainment; the defendant also stated that he had approximately $2,000 in his truck and asked the detectives whether the murder with which he had been charged was a "planned murder," an "unplanned murder," or a murder that results from a "crime of passion"; he did not notice any injuries to the defendant during the interview; he was not aware whether the defendant had reported any injuries to any law enforcement agency; he inspected and photographed the defendant's truck; he found approximately $1,500 in cash and a series of gold coins of various denominations; during the investigation, he learned from the Department of Homeland Security that the defendant had renewed his passport on August 19, 2014, less than a month before Godley's murder; he also learned of a police report filed on May 12, 2012, by an employee of Fitness World, who reported that he had found a .45 caliber Colt Defender handgun, serial number DR31076, in a locker at the gym; the gun, which was turned in at the SPD, was later retrieved by the defendant; and forensic experts later concluded that the Colt .45 was the weapon used to kill Godley.
Dr. James Taylor, an associate clinical professor and director of autopsy and forensic *1269 services at the LSU Health Sciences Center, testified as follows: he performed the autopsy on Godley; he determined that Godley died from multiple gunshot wounds and ruled her death a "homicide"; Godley had been shot five times: she had one "graze wound" to her left leg, one "perforating" wound to the posterior left thigh, one "perforating" wound to her left shoulder,[10] and two wounds to the back; four of the five gunshots (with the exception of the one to the left shoulder) were fired while Godley was lying in a prone position on the floor; one of the shots to Godley's back severed her spine and that shot, alone, would have killed her; Godley's blood alcohol level was .117, and she had Prozac, an antidepressant, in her system; and a blood alcohol level of .117 can result in impaired judgment, loss of critical thinking, decreased reaction time and loss of inhibitions.
Carla White, a firearms examiner with the North Louisiana Criminalistics Laboratory in Shreveport, Louisiana ("the crime lab"), also testified at trial. White stated that the crime lab received the following items: a .45 caliber Colt Defender 90 lightweight pistol, bearing the serial number DR31076; four "live" .45 caliber cartridges; one bullet that had been retrieved from Godley's body; three additional bullets; and four "spent" .45 caliber cartridge casings. White described the process for verifying a murder weapon. She stated that she "test-fired" the .45 Colt into a water tank; she then examined the expelled casings and the bullets under a microscope and she compared the casings and bullets to those recovered from the crime scene. White concluded that the bullet recovered from Godley's body, the bullets found in the house and the test-fired bullets came from the Colt .45 caliber handgun that had been retrieved from Godley's house. She further concluded that the casings found at the scene of the crime and those from the test firing came from the same weapon.[11]
Multiple witnesses testified that numerous guns were retrieved from the house the defendant shared with Godley and that guns were found in every room in the house. The witnesses also testified that Godley carried a gun in the glove compartment of her vehicle and that she usually carried one in her handbag. Further, the witnesses testified that the defendant always carried a Colt .45 handgun on his hip while he was working at the tavern; he had a handgun attached underneath the bar at the tavern; and he had multiple guns in his office at the tavern. According to Peter Fetterman, the defendant would sometimes place a gun on the bar at closing time and would state, "Time to go," in an effort to intimidate the customers into making a speedy exit.
Additionally, multiple witnesses testified with regard to the relationship between the defendant and Godley. The witnesses testified that the couple often argued; however, the evidence was contradictory as to which party was the aggressor in the arguments. Fetterman testified that the defendant and Godley sometimes yelled at one another and "got into" each other's "personal space." Eric Johnson testified that he had witnessed multiple incidents during which Godley pushed or hit the defendant in the chest during arguments. Johnson also stated that he did not believe the physical contact between Godley and the defendant was "serious," and law enforcement was never called. Johnson *1270 testified that he had never seen the defendant "get physical" with Godley.
Callie Bunton, a mutual friend of the defendant and Godley and former employee of the tavern, testified as follows: Godley was often intoxicated; she had seen Godley "act abusively" toward the defendant, who would respond "passively"; she had witnessed Godley "get mad at [the defendant] and shove him and get in his face and scream at him and tell him that she hated him"; in response to Godley's behavior, the defendant would "hang his head" until Godley "calmed down"; and Godley had told her that, in the past, she had shot one of her ex-husbands. Bunton admitted that she had never reported the incidents to law enforcement and she did not believe that the defendant was afraid of Godley.
Barry Humphrey, Godley's childhood friend, testified that Godley could be "intimidating." However, he stated that he had never seen her "get physical" with the defendant. Humphrey also testified that several years prior to her death, Godley had confided in him that the defendant had "gotten rough" with her. He stated that he understood Godley's statement to mean that the defendant was physically abusive to her.
Thereafter, the state introduced evidence of the defendant's prior domestic abuse against Godley, as well as the incidents involving Summer Bailey and Robert Brocato. Steward Kite, a former police officer with the SPD, testified that he investigated a domestic battery incident that had been reported by Godley on January 25, 2011. Officer Kite testified as follows: he arrived at Godley's residence to find her "crying and pretty shaken"; Godley "related that her live-in boyfriend, Mr. Mark Colby, had threatened her life by putting a knife to her neck on the way home from [the tavern]"; Godley also reported that while driving home from the bar, she informed the defendant that she was moving out of the house because he was physically and psychologically abusive to her; Godley further stated that she had told the defendant that she was going to call animal control and have his dogs taken away from him; additionally, Godley told the officer that, in response to her statements, the defendant stopped his vehicle, "put a knife to her throat and threatened to kill her." According to Officer Kite, he then arrested the defendant for domestic abuse battery.
Summer Bailey testified that in 2004, she worked at the tavern as a dishwasher and "prep cook." She described an incident that occurred on November 28, 2004, as follows:
[The defendant and Godley] came in the restaurant and they were arguing and [Godley] said something to me. I said something to her and then [the defendant] pulled a gun out and he shot in between my legs and then he-he got to me really fast and he put his hand around my throat and knocked me off where I was sitting and then he picked me up from where I was, took me to the other end of the restaurant and slammed me up against a brick wall a couple of times where my feet were off the ground where I couldn't touch it, with a gun to my head telling me that he was going to f*cking kill me, did I understand him.
And he kept doing it and then I couldn't breathe and he had kept asking me if I understood him and I was looking at the ground and I couldn't reach the ground to leave. And then he finally threw me down and pointed a gun at me and he told me that he was going to kill me[.]
Bailey stated that she reported the incident to the SPD.
Dr. Robert Brocato testified that on November 18, 2006, while he was enrolled in *1271 medical school, he and some friends visited the tavern. Brocato testified as follows: he went to the restroom and kicked a glass that was on the floor; the defendant "rushed" into the restroom, put a gun to his (Brocato's) head and accused him of "breaking his stuff"; while holding the gun to Brocato's head, the defendant tilted the barrel of the gun up into the air and fired it; the defendant's actions caused his (Brocato's) eardrum to be ruptured, resulting in permanent hearing loss; the attack was unprovoked; and prior to that incident, he and the defendant had never had an argument or altercation.
The defendant did not testify at trial. However, through counsel, he argued that he shot Godley in self-defense.
At the conclusion of the trial, a unanimous jury found the defendant guilty as charged of second degree murder. Thereafter, the defendant was sentenced to serve life in prison, at hard labor, without the benefit of parole, probation or suspension of sentence.
The defendant now appeals.
DISCUSSION
Evidence of "Other Crimes, Wrongs or Acts"
The defendant contends the trial court erred in allowing the state to introduce evidence of other crimes, wrongs or acts. The defendant sets forth multiple arguments regarding the "other crimes" evidence. The arguments are as follows: he was prejudiced by the court's ruling because the evidence portrayed him as a "deviant criminal, such that the probative value of the evidence was far outweighed by the prejudice it created in the minds of the jurors"; the prejudicial impact of the "other crimes" evidence was heightened by the trial court's failure to provide the jury with the requisite limiting instruction with regard to the evidence; the court's failure to instruct the jury affected the jury's ability to give the proper weight to the "other crimes" evidence; the state cannot rely on "boilerplate" recitation of the grounds for admissibility under La. C.E. art. 404(B) ; pursuant to State v. Taylor , 2016-0124 (La. 12/1/16), 217 So.3d 283, before the trial court can rule on the admissibility of other crimes evidence, the state must address each prior bad act in a Prieur hearing and establish that each act is substantially relevant to a material issue in the case; the state did not submit arguments or evidence to support three of the four alleged bad acts; the state failed to prove that the prior domestic abuse charge regarding Godley was substantially relevant to a material issue in this case; the trial court erred by not allowing defense counsel the opportunity, in the Prieur hearing, to present arguments against the admission of the evidence; and the four prior bad acts had little, or no, probative value because they lacked sufficient similarities to Godley's shooting. Specifically, the defendant argues as follows:
1. In the instant case, he was defending himself against Godley, while, in the incident with Bailey, he was protecting Godley from Bailey's verbal attack;
2. In the incident with Brocato, he was protecting his property, and Godley was not present when the incident occurred; and
3. The incident involving leaving his gun at the gym and retrieving it from the SPD was not a prior crime, wrong or bad act; therefore, that evidence was not relevant to this case.[12]
*1272 Courts may not admit evidence of other crimes to show the defendant as a person of bad character who has acted in conformity with his bad character. La. C.E. art. 404(B)(1) ; State v. Rose , 2006-0402 (La. 2/22/07), 949 So.2d 1236 ; State v. Jackson , 625 So.2d 146 (La. 1993) ; State v. Howard , 47,495 (La. App. 2 Cir. 11/14/12), 106 So.3d 1038 ; State v. Morgan , 45,110 (La. App. 2 Cir. 4/14/10), 34 So.3d 1127, writ denied , 2010-1201 (La. 5/27/11), 63 So.3d 992. Evidence of other crimes, wrongs or bad acts committed by the defendant is generally inadmissible because of the "substantial risk of grave prejudice to the defendant." State v. Prieur , 277 So.2d at 128 ; State v. Howard , 106 So.3d at 1044. However, the state may introduce such evidence if it establishes an independent and relevant reason such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. La. C.E. art. 404(B)(1).
The defendant is entitled to notice and a hearing before trial if the state intends to offer such evidence. State v. Prieur , supra. Even when other crimes evidence is offered for a purpose allowed by Article 404 B(1), the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. State v. Taylor , supra ; State v. Altenberger , 2013-2518 (La. 4/11/14), 139 So.3d 510 ; State v. Jacobs , 1999-0991 (La. 5/15/01), 803 So.2d 933, cert. denied , 534 U.S. 1087, 122 S.Ct. 826, 151 L. Ed. 2d 707 (2002) ; State v. Howard , supra ; State v. Rose , supra. The state bears the burden of proving, by a preponderance of the evidence, that the defendant committed the other crimes, wrongs or acts. State v. Taylor , supra ; State v. Galliano , 2002-2849 (La. 1/10/03), 839 So.2d 932 (per curiam ).
The district court, in its gatekeeping function, must determine the independent relevancy of the evidence and balance the probative value of the prior bad acts evidence against its prejudicial effects before the evidence can be admitted. Huddleston v. United States , 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) ; State v. Miner , 2017-1586 (La. 1/4/18), 232 So.3d 551 ; State v. Taylor , supra ; State v. Henderson , 2012-2422 (La. 1/4/13), 107 So.3d 566. Any inculpatory evidence is "prejudicial" to a defendant, especially when it is probative to a high degree. "Prejudicial," in this context, means that probative evidence of prior misconduct is excluded only when it is unduly and unfairly prejudicial. State v. Taylor , supra ; State v. Rose , supra ; State v. Germain , 433 So.2d 110 (La. 1983). The term "unfair prejudice," as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged. Old Chief v. United States , 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) ; State v. Taylor , supra.
A trial court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. State v. Taylor , supra ; State v. Galliano , supra ; State v. Parker , 42,311 (La. App. 2 Cir. 8/15/07), 963 So.2d 497, writ denied , 2007-2053 (La. 3/7/08), 977 So.2d 896. Further, an erroneous introduction of other crimes evidence is subject to harmless error review. State v. Reed , 43,780 (La. App. 2 Cir. 12/3/08), 1 So.3d 561, writs denied , 2009-0014, 0160 (La. 10/2/09), 18 So.3d 100, 103; State v. Gatti , 39,833 (La. App. 2 Cir. 10/13/05), 914 So.2d 74, writ denied , 2005-2394 (La. 4/17/06), 926 So.2d 511. The test for determining harmless error is whether the reviewing court may conclude the error was harmless beyond a reasonable doubt, State v. Casey , 1999-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied , *1273 531 U.S. 840, 121 S.Ct. 104, 148 L. Ed. 2d 62 (2000), or "whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Sullivan v. Louisiana , 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). See also , State v. Reed , supra ; State v. McGee , 39,336 (La. App. 2 Cir. 3/4/05), 895 So.2d 780 ; State v. Bratton , 32,090 (La. App. 2 Cir. 6/16/99), 742 So.2d 896.
We have reviewed this record in its entirety. The key inquiry regarding the admissibility of the evidence regarding each of the defendant's prior bad acts is whether the evidence was relevant to serve some independent purpose, apart from merely showing that the defendant is a bad person. At the Prieur hearing, the state presented the following witnesses, all of whom were cross-examined by the defendant, to prove that each of the four prior bad acts occurred. The testimony was as follows:
1. Det. Dailey, of the SPD, testified with regard to the 2012 incident, when the defendant claimed ownership of a Colt Defender .45 caliber handgun, serial number DR31076, which the SPD believed to be the murder weapon. The information was recorded on a SPD property receipt.
2. Steve Masson, of the SPD, testified regarding Godley's domestic abuse complaint on January 25, 2011, wherein Godley accused the defendant of holding a knife to her throat and threatening to kill her after a night of drinking and arguing. An arrest affidavit was issued for domestic abuse battery.
3. Sgt. Dwayne Kevin Cortez, of the SPD, testified as to Bailey's 2004 report that the defendant became angry because Bailey asked an intoxicated and belligerent Godley to leave the tavern. The defendant fired a .45 handgun into the floor, grabbed Bailey by the neck and slammed her against a brick wall two or three times and then told her to leave the tavern.
4. Investigator Rob Demery, previously employed by the SPD as a homicide investigator, testified regarding Brocato's 2006 complaint that the defendant, angry that Brocato, a customer at the tavern, broke a glass, put a gun to the side of Brocato's head and fired it. A .45 caliber shell casing was found on the floor indicating that the gun was a .45. The state introduced a bill of information and certified minutes showing that the defendant was convicted of aggravated assault arising from the Brocato incident.
At the conclusion of the testimony, the trial court heard arguments concerning the domestic abuse incident between Godley and the defendant. The state argued that the 2011 domestic violence incident with Godley was relevant to show identity, absence of mistake or accident and motive by modus operandi, as it showed a deviant attitude toward women, particularly Godley.
After the parties' arguments regarding the prior domestic incident, the trial court inquired, "Anything further?" The defense responded, "Not on this one, Your Honor." The trial court then stated: "All right. So we'll take a 10-minute recess, and I'll be right back and rule on this matter." Immediately upon returning from the recess, the trial court issued the following ruling: "After considering the testimony, arguments of counsel, and the applicable law, the Court finds that the evidence meets the statutory requirements and is therefore admissible."
We find that the trial court did not abuse its discretion with regard to the admissibility of evidence of other crimes, wrongs and bad acts. In any event, any error that may have occurred in admitting the evidence is harmless in light of the overwhelming evidence demonstrating the defendant's guilt.
*1274 The defendant's argument that he did not have an adequate opportunity to present substantive arguments opposing the state's Prieur notice prior to the trial court ruling in the state's favor is without merit. The defense was able to cross-examine the witnesses. Further, the defendant did not object or otherwise inform the trial court that he had additional arguments with regard to the Article 404(B) evidence. Additionally, contrary to the defendant's contention, there is no requirement that the state specifically address the connection between each prior bad act and the material issue to which it was relevant. In State v. Taylor , supra , the Louisiana Supreme Court recognized that a Prieur hearing is not intended to be a "mini-trial" of the prior offenses. In that regard, the court stated:
The state is simply required to make some showing of sufficient evidence to support a finding that defendant committed the other act. We cannot mandate or prohibit a specific form of evidence applicable to every case. Although testimony is not required, it may be necessary depending on the facts of a particular case. Other times the submission of documents, such as a police report or conviction, and a summation of the other crime, wrong, or act will suffice. Sufficiency of the state's evidence naturally must be determined on a case by case basis.
Id. at 292.
Further, although the defendant did not deny committing the prior bad acts, the state submitted sufficient evidence, through witnesses and documentation, to show that the defendant had committed them. The defense cross-examined each of the state's witnesses. The trial court upheld its gatekeeping duty in finding the four prior bad acts admissible and expressly stated that in reaching its decision, it considered the testimony of the witnesses and the law.
The trial court did not abuse its discretion in finding that each of the prior incidents identified by the state in its Prieur notice was admissible. Specifically, the prior incident involving the gun the defendant claimed from the SPD is not a "bad act" as contemplated by La. C.E. art. 404(B). Although it was not an attack on the defendant's character, the evidence was relevant and admissible to show that the murder weapon belonged to the defendant. The Colt .45 that was left at the gym, and retrieved by the defendant from the SPD, was the same make and model, and had the same serial number, as the handgun that forensic experts identified as the murder weapon.
The incidents involving Bailey and Brocato involved the defendant losing his temper at perceived and seemingly insignificant threats, and using a gun against the object of his anger. Those incidents are relevant to show intent and to negate any claim of self-defense by the defendant. Intent is a condition of mind which is usually proved by evidence of circumstances from which intent may be inferred. State v. Hearold , 603 So.2d 731 (La. 1992). When intent is an issue, similar unrelated conduct is admissible to negate a defense theory that the accused acted without criminal intent and to show that he intended to commit the charged offense. State v. Kennedy , 2017-0724 (La. 9/29/17), 227 So.3d 243 ; State v. Taylor , supra. While the prior acts must be similar, they need not be part of a scheme, as other similar acts, whether part of a scheme or not, are useful at reducing the possibility that the act in question was done with innocent intent. State v. Smith , 513 So.2d 438 (La. 1987).
Moreover, prior instances of abuse, threats, and incidents of violence, between persons involved in a romantic relationship are admissible under *1275 La. C.E. art. 404 to show that the charged crime was an action in conformity with a pattern of behavior between the victim and the defendant.[13] In State v. Welch , 615 So.2d 300 (La. 1993), the Louisiana Supreme Court explained:
[T]he state could not place the circumstances of the offense in their proper context without reference to the nature of the relationship existing between the victim and the defendant[.] The primary purpose of the evidence [of prior acts of violence or threats of violence] was not to prove [the defendant's] bad character but to illustrate the volatile nature of his relationship with the victim[.]
Id. at 303.
The defendant argues that evidence of prior acts of violence is not admissible when it involves violence against a third person, not the victim in the case. On the contrary, acts of violence against third persons are admissible when the acts meet a 404(B) exception and are relevant to a material fact in the case.[14] In support of his argument, the defendant cites State v. Davis , 2005-733 (La. App. 5 Cir. 2/27/06), 924 So.2d 1096 In that case, the Fifth Circuit held that the evidence was inadmissible because the state failed to establish a connection between the defendant's threat against his wife and the murder of her boyfriend, such that it could be used to establish motive or intent. The Fifth Circuit's decision was based on the particular facts of the case. The court held that there was little probative value to the evidence of the threat to the wife because the defendant did not include the wife's boyfriend in his threat and the wife's boyfriend was not present when the threat was made.
In this case, the prior bad acts submitted by the state showed that the defendant pulled a .45 handgun in anger and that he threatened to kill on two prior occasions. Further, the evidence established that the defendant had also fired a gun in close proximity to the persons who had angered him. Additionally, the evidence revealed that the defendant had also held a knife to Godley's throat when she angered him. The probative value of the defendant's prior acts of violence against Godley, Bailey and Brocato was substantial, as they show that the defendant *1276 had a pattern and practice of reacting violently to seemingly insignificant stressors, and that he is quick to display and use a weapon. Consequently, we find that the evidence is probative to show that the defendant would be more likely to kill or seriously injure Godley when he was angry with her, and its probative value is not outweighed by any prejudice. Further, the defendant claimed self-defense at trial, and his identity as the shooter was no longer an issue. The evidence that the defendant carried a Colt .45 on his person, that the murder weapon was a Colt .45 owned by the defendant, and that he had used the gun on others, was relevant to show intent, pattern and plan, opportunity and to negate the defendant's claim of self-defense.[15]
Regardless, even if the admission of the prior incidents involving Godley, Bailey and/or Brocato was error, it was harmless error. While the case against the defendant was largely circumstantial, there is an abundance of evidence that the defendant shot Godley with specific intent to kill her or cause her great bodily harm. In that regard, the overwhelming evidence showed that the defendant shot an unarmed Godley five times with a .45 semi-automatic handgun. Four of the gunshots fired by the defendant were at close range, while Godley was lying face-down on the laundry room floor.[16] The defendant fled *1277 the country, with approximately $2,000 in cash and gold coins, the day that Godley was killed. This circumstantial evidence is probative of the defendant's guilty mind, especially in light of the fact that the defendant had told Johnson that he would flee the country if he ever "got in trouble."[17] Furthermore, the defendant did not claim self-defense during his interview with the detectives. Rather, he asked if he was being charged with the type of murder that occurs in the "heat of passion."
The defendant further asserts that the trial court failed to give the proper limiting instructions to the jury. When "other crimes" evidence is admitted in a jury trial, the court, upon the defendant's request, must charge the jury as to the limited purpose for which the evidence is to be considered. Moreover, the final jury charge must contain an instruction regarding the limited purpose for which the "other crimes" evidence was received. At that time, the court must instruct the jurors that the defendant cannot be convicted of any charge other than the one named in the indictment, or one responsive thereto. State v. Prieur , 277 So.2d at 130. See also , State v. Kennedy , 2000-1554 (La. 4/3/01), 803 So.2d 916.
The defendant's contention that the other crimes evidence should not have been admitted because the jury was not provided with the limiting instruction is raised for the first time in this appeal. Further, the defendant did not object to the jury charge on these grounds at trial.
A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. La. C. Cr. P. art. 801(C). Further, it is well established that a defendant is limited to the grounds for objection articulated at trial and a new basis for an objection may not be raised for the first time on appeal. State v. Delaney , 42,990 (La. App. 2 Cir. 2/13/08), 975 So.2d 789 ; State v. Small , 29,137 (La. App. 2 Cir. 04/02/97), 693 So.2d 180 ; State v. Plater , 606 So.2d 824 (La. App. 2 Cir. 1992).
Thus, the requirements of State v. Prieur , supra , notwithstanding, the defendant waived any right to a limiting jury instruction when he failed to request a special jury charge and failed to timely object to the final jury charges.[18] Accordingly, the defendant's assignments of error *1278 with regard to the "other crimes" evidence are without merit.
Evidence of the Victim's "Dangerous Character"
The defendant contends the trial court erred in prohibiting him from eliciting testimony concerning Godley's prior "violent and aggressive acts" toward others. Specifically, the defendant complains that he was not allowed to cross-examine Applewhite, Godley's cousin, regarding offenses Godley allegedly committed against third parties when she was "younger" and/or was "either a high school or grammar student." He urges that evidence of Godley's "dangerous character" was admissible to show that Godley was the aggressor in the incident that led to her death, and he acted out of reasonable fear of danger to himself. The defendant also maintains that he laid the proper foundation, set forth in La. C.E. art. 404(A)(2), to present evidence of Godley's dangerous character to support his plea of self-defense; therefore, he should have been allowed to show Godley's dangerous character, not only by her prior threats against him, but by her general reputation in the community as a "violent and aggressive person" and by specific acts to third persons known to him. State v. Jackson , 419 So.2d 425 (La. 1981) ; State v. Adams , 2017-0419 (La. App. 1 Cir. 12/29/17), 2017 WL 6629300 ; State v. Loston , 2003-0977 (La. App. 1 Cir. 2/23/04), 874 So.2d 197, writ denied , 2004-0792 (La. 9/24/04), 882 So.2d 1167.
When a defendant attempts to present evidence of a victim's character, it must be for a relevant purpose, such as self-defense. See La. C.E. art. 401 ; State v. Johnson , 41,428 (La. App. 2 Cir. 9/27/06), 940 So.2d 711, writ denied , 2006-2615 (La. 5/18/07), 957 So.2d 150. Thus, character evidence that paints the victim as a bad person deserving his or her fate of death at the hands of the defendant is prohibited by La. C.E. art. 404. State v. Johnson , supra ; State v. Wade , 33,121 (La. App. 2 Cir. 5/15/00), 758 So.2d 987, 996, writ denied , 2000-2160 (La. 9/28/01), 797 So.2d 684.
La. C.E. art. 404(A)(2) provides, in pertinent part:
Character of victim. (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible; provided further that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible[.]
La. C.E. art. 404(A)(2) contains a "domestic violence exception," wherein it is not necessary that the accused present appreciable evidence of a hostile demonstration or overt act by the victim at the time of the offense charged to introduce evidence of the victim's dangerous character. In State v. Rodrigue , 1998-1558 (La. 4/13/99), 734 So.2d 608, the supreme court stated:
[E]vidence of a person's character generally is inadmissible to prove that the *1279 person acted in conformity with his or her character on a particular occasion. However, there are several specific exceptions to this general rule. With respect to evidence of the dangerous character of the victim of a crime, such evidence is admissible (1) when the accused offers appreciable evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, or (2) when the accused, relying on the defense of self-defense, establishes (a) a history of assaultive behavior between the victim and the accused and (b) a familial or intimate relationship between the victim and the accused. When the latter exception has been established, the accused may offer evidence of specific instances of dangerous conduct and domestic violence without establishing a hostile demonstration or overt act by the victim.
Id. at 610-11. A trial judge's determination that a defendant has not laid a sufficient evidentiary foundation upon which to introduce testimony concerning the victim's dangerous character will not be disturbed on appeal, absent a finding of clear error. State v. Jackson , 419 So.2d 425 (La. 1981) ; State v. Coleman , 48,168 (La. App. 2 Cir. 7/17/13), 121 So.3d 703, writ denied , 2013-1990 (La. 5/2/14), 138 So.3d 1237.
As stated above, at trial, the defendant relied on a defense of justification. Additionally, the testimony presented at trial established that the defendant and Godley "lived in a familial or intimate relationship" and that there was a "history of assaultive behavior" between the defendant and Godley. See La. C.E. art. 404(B)(2).
During the trial, defense counsel attempted to cross-examine Applewhite as follows:
[Defense Counsel]: And I've indicated and I represent that [Godley] had a dual personality. Would you agree with that?
[Applewhite]: No.
[Defense Counsel]: She could be sweet. Correct?
[Applewhite]: She was very sweet.
[Defense Counsel]: But there were times when she wasn't so very sweet. Is that correct?
[Applewhite]: Well, everybody has times that they're not themselves.
[Defense Counsel]: But [Godley's] would go a little further than that, would it not?
The state objected to that line of questioning and a bench conference was held. Thereafter, when questioning resumed, defense counsel questioned Applewhite as follows:
[Defense Counsel]: Ms. Applewhite, were you present with [Godley] when, as younger cousins, the two of you beat one of your other cousins with a baseball bat?
[Applewhite]: I've never heard of that.
[Defense Counsel]: You weren't present?
[Applewhite]: I've never heard of that.
[Defense Counsel]: Are you aware of [Godley], as either a high school or grammar student, using your grandfather's straight razor on two young ladies?
[Applewhite]: Never heard that. Never ever have I heard that.
[Defense Counsel]: Do you dispute it?
[Applewhite]: I can't dispute it, but I've never heard about it. But I've never heard about it. Why would I not have heard about that?
Again, the state objected "regarding the line of questioning by defense counsel regarding alleged events that happened-that allegedly the victim committed against other people." The trial court sustained the objection and admonished the jury as follows:
*1280 Ladies and gentlemen of the jury, let me admonish you that the questions asked by the defense with respect to alleged assaultive behavior by the victim towards other people is not admissible, and you're asked to disregard those questions as not permissible by law.
Other witnesses testified, without objection, that the defendant and Godley often argued and that Godley sometimes "got physical" with the defendant by pushing him or hitting him in the chest. Significantly, however, the witnesses testified that they did not consider Godley's behavior to be a serious threat to defendant. The defendant did not submit evidence of prior assaultive behavior by Godley against him that would reasonably place him in fear of harm. None of the witnesses testified that Godley had ever threatened the defendant or harmed him in a manner that would have placed him in fear of great bodily harm. Further, although the defendant alleged that Godley had committed offenses against third parties when she was in high school or grammar school, he failed to present any evidence to prove those allegations. Accordingly, we find that the trial court did not err in sustaining the state's objections to the admission of evidence regarding Godley's general character or alleged acts against third parties. This assignment of error lacks merit.
Jury Challenge
The defendant contends the trial court erred in denying his challenge for cause with regard to prospective juror Jimmy Moore. The defendant urges that Moore could not be a fair and impartial juror for the following reasons: (1) Moore admitted that he heard "police talk" about the case; (2) Moore worked in the Caddo Parish courthouse and frequently saw Britney Green, the assistant district attorney, walking to and from the courthouse parking lot; (3) Moore was aware that the defendant had fled to Mexico; and (4) Moore stated that he believed flight is an indicator of guilt. The defendant argues that the trial court's denial of his challenge for cause is reversible error because he had already used all of his 12 peremptory challenges.
La. Const. art. I, § 17 (A) guarantees a defendant the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. Both the defendant and the state are given 12 peremptory challenges in trials of offenses punishable by death or necessarily by imprisonment at hard labor. La. C. Cr. P. art. 799. In addition to his constitutionally guaranteed peremptory challenges, a defendant may challenge a juror for cause on several grounds set forth in La. C. Cr. P. art. 797, which include that, inter alia :
* * *
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
* * *
(4) The juror will not accept the law as given to him by the court.
In a challenge for cause, the challenging party has the burden of showing that a prospective juror should be excluded based on one or more of the grounds in La. C. Cr. P. art. 797. State v. Hust , 51,015 (La. App. 2 Cir. 1/11/17), 214 So.3d 174, writ denied , 2017-0352 (La. 11/17/17), 229 So.3d 928, citing State v. White , 535 So.2d 929 (La. App. 2 Cir. 1988), writ denied , 537 So.2d 1161 (La. 1989). Reversible error is demonstrated and prejudice is presumed in cases in which a defense challenge for cause was erroneously denied and the defendant ultimately exhausted his peremptory challenges.
*1281 State v. Coleman , 2014-0402 (La. 2/26/16), 188 So.3d 174, cert. denied , --- U.S. ----, 137 S.Ct. 153, 196 L.Ed.2d 116 (2016) ; State v. Jones , 2003-3542 (La. 10/19/04), 884 So.2d 582. In such a case, a defendant is required to show that the trial court abused its discretion in denying any one of his challenges for cause. State v. Coleman , supra.
A potential juror who is associated with law enforcement duties must be closely scrutinized and may justify a challenge for cause; however, such association is not an automatic disqualification. State v. McIntyre , 365 So.2d 1348 (La. 1978) ; State v. Hampton , 50,561 (La. App. 2 Cir. 5/18/16), 195 So.3d 548, writ denied , 2016-1181 (La. 5/26/17), 221 So.3d 854. A prospective juror's association with law enforcement is grounds for disqualification only if one might reasonably conclude that it would influence him in arriving at a verdict. State v. Hampton , supra ; State v. Rhodes , 1997-1993 (La. App. 4 Cir. 11/18/98), 722 So.2d 1078. Louisiana courts have generally disqualified persons who are currently actively associated with law enforcement. However, courts have also held that there is no abuse of discretion in denying a challenge for cause where "a juror's association with law enforcement has ended by the time of trial, he has no personal knowledge of the case at hand, and he states that he can be impartial despite the prior law enforcement background." State v. White , supra ; State v. Rhodes , supra.
A trial court is vested with broad discretion in ruling on challenges for cause and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Tucker , 2013-1631 (La. 9/1/15), 181 So.3d 590, cert. denied , --- U.S. ----, 136 S.Ct. 1801, 195 L.Ed.2d 774 (2016) ; State v. Cross , 1993-1189 (La. 6/30/95), 658 So.2d 683 ; State v. Hust , supra ; State v. Hampton , supra. A trial court's refusal to disqualify a prospective juror is not an abuse of discretion or a reversible error if the perceived bias or lack of impartiality of the prospective juror is properly remedied through rehabilitation. State v. Hust , supra ; State v. Mickelson , 2012-2539 (La. 9/3/14), 149 So.3d 178 ; State v. Howard , 1998-0064 (La. 4/23/99), 751 So.2d 783, cert. denied , 528 U.S. 974, 120 S.Ct. 420, 145 L. Ed. 2d 328 (1999). A prospective juror can be rehabilitated if the court is satisfied that the juror can render an impartial verdict according to the evidence and instructions given by the court. State v. Hust , supra ; State v. Hampton , supra.
During voir dire , Moore stated as follows: he had a long history of working in law enforcement; he worked as a police officer in Winnfield, Louisiana, from approximately 1974 through 1981, and with the SPD from 1981-2011; after retiring from the SPD in 2011, he began working for the Caddo Parish Sheriff's office. Thereafter, the following colloquy transpired:
[The State]: All right. And let me ask you, Mr. Moore, would that-knowing that the law says that even for a law enforcement officer or someone involved in the criminal justice system that you have to come in, you have to listen to the facts and evidence presented and you can only base your decision on the facts and evidence presented and not on your personal background, even as a law enforcement officer ... having to set it aside and only listen to the facts and evidence and render a decision based on those things, can you follow the law on that?
MR. MOORE: Yes.
[The State]: And, Mr. Moore, as I said, you and I see each other as-after I park my car and I'm walking over into the courtroom some morning, maybe a *1282 couple of days a week or something like that, would that have any affect [sic ] on how you render a decision in this case?
MR. MOORE: No.
[The State]: And the fact that you see me coming and going and know that I work as an assistant district attorney, would that have any bearing on your decision-making in this case?
Mr. MOORE: No.
Thereafter, defense counsel asked Moore if he was comfortable, as a law enforcement officer, with the premise that the defendant is presumed innocent until proven guilty. Moore responded, "Yes." Moore also stated that he could find the defendant innocent if the state did not defeat his self-defense claim beyond a reasonable doubt. Subsequently, during an individual voir dire, Moore answered as follows:
[THE STATE]: Mr. Moore, during our discussions, you indicated that you may have-you may have had some information regarding the case. Is that something from news reports or-
Mr. MOORE: News reports and just overhearing things .... Police talk.
[THE STATE]: Okay, now, Mr. Moore, the law requires that you base any decision only on the facts and evidence presented here. And I know we had this discussion as well when we talked about your background in law enforcement and your ability to be a fair and impartial juror. As it relates to the information that you learned, you would have to set any of that information aside in order to be-in order to render a fair, honest and unbiased verdict. Would you be able to do that?
MR. MOORE: I believe-I want to believe I could, yes.
[THE STATE]: Okay. Because that's what the law requires. And you said you had-you had gleaned some stuff from some newspaper reports and some conversations?
MR. MOORE: Yeah. Just overheard the news-the news.
[THE STATE]: Okay. And has anything that you learned-knowing that the law requires you to base your decision only on facts and evidence presented here and at this point in time, the defendant is presumed innocent. Has anything that you learned outside of court forced you to come to a decision already without knowing any facts or evidence?
MR. MOORE: As far as saying guilt or innocence, no. I don't know.
[THE STATE]: Okay. You don't know. And as the defendant sits here today, he's presumed innocent and do you accept that?
MR. MOORE: Yes.
[THE STATE]: Can you follow the law on that?
MR. MOORE: Yes.
[THE STATE]: Okay. And so despite having heard some information, you are undecided and will you wait to hear the facts and evidence before you render a decision in this case as required by law?
MR. MOORE: Yeah, I would.
[THE STATE]: You'll wait until you hear the facts and evidence presented before you make a decision?
MR. MOORE: Yes.
[THE STATE]: Okay.
MR. MOORE: Based on 35 years of police work and being a police officer, you know, there's things you hear that don't sound good.
* * *
[THE STATE]: So, Mr. Moore, you were talking about your experience in-experience with law. And so with that 35 years, would you agree that you are bound to follow the law?
*1283 MR. MOORE: Correct.
[THE STATE]: Okay. And would you be able to follow the law and render a decision based on the facts and evidence in this case?
MR. MOORE: Yes.
Defense counsel then questioned Mr. Moore as follows:
[DEFENSE COUNSEL]: [Y]ou indicate that you overheard police talk about this case; is that correct?
MR. MOORE: Well, mostly news and chaos, and, you know, I've overheard police around discussing it.
[DEFENSE COUNSEL]: What have you heard?
MR. MOORE: Well, you know, as far as he had-the defendant had killed a wife, girlfriend or business acquaintance and he fled-tried to flee to Mexico.
* * *
[DEFENSE COUNSEL]: Did that lead to any conclusions?
MR. MOORE: Well, I don't know if I buy your scenario of if you flee, you're-that's just as well as not fleeing if you're innocent, you know.
[DEFENSE COUNSEL]: So in your 35 years, in your personal opinion that means he's guilty; is that correct?
MR. MOORE: No. As it stands right now, by law, he's innocent.
[DEFENSE COUNSEL]: When you heard that he fled, what conclusion did you come to?
MR. MOORE: I thought he might have done it.
[DEFENSE COUNSEL]: Okay. And who did you hear information from? What police did you hear from?
MR. MOORE: I-you know. It's just-nobody in particular. I mean, it's just, you know, around the-don't have any names to give you.
* * *
MR. MOORE: But that was on the news, wasn't it?
[DEFENSE COUNSEL]: Now, when [the assistant district attorney] asked you some questions regarding whether or not you had reached a conclusion, as I observed your body language, it appeared as though you were hesitating and having some struggle with that.
MR. MOORE: About already reaching a decision?
[DEFENSE COUNSEL]: Yes, sir.
MR. MOORE: No, I haven't.
[DEFENSE COUNSEL]: You haven't come to any decision?
MR. MOORE: I haven't reached a decision of guilt or innocence.
[DEFENSE COUNSEL]: What conclusions have you come to?
MR. MOORE: Well, other than that, I don't have any conclusions. I-you know, I haven't reached a guilt or innocence [sic].
[DEFENSE COUNSEL]: You haven't reached an ultimate conclusion?
MR. MOORE: Correct.
[DEFENSE COUNSEL]: What conclusions have you reached?
MR. MOORE: I-I know what I've heard on the news and, you know, around about the case. I haven't decided guilt or innocence.
[DEFENSE COUNSEL]: You said when you learned that he fled that you thought that might mean that he did not; is that correct?
MR. MOORE: It's a good indicator, yes.
[DEFENSE COUNSEL]: In your 35 years, have you ever felt otherwise?
MR. MOORE: In-no. I mean, in some cases, I could understand it, but, for example, your scenario of the lights coming on and someone behind-police *1284 stopping you or what-according to the law, you pull over and see.
[DEFENSE COUNSEL]: Well, I'm saying in your 35 years of being - you work with the Caddo Sheriff's Department?
MR. MOORE: Well, I worked with the SPD and now with Caddo, yes.
[DEFENSE COUNSEL]: Okay. And in your 35 years of police work, have you ever concluded that someone who fled the scene did not commit the crime?
MR. MOORE: Not based only on that, no.
[DEFENSE COUNSEL]: Okay. Your conclusion was always that they committed the crime; is that correct?
MR. MOORE: No. I just said not solely based on the fact that they fled that they were guilty, no.
[DEFENSE COUNSEL]: Okay. And you indicated when I was talking about whether or not if the State didn't defeat his self-defense claim beyond a reasonable doubt, asked you if you'd be able to face Ms. Green, if you'd be okay with that and you stated that you'd be okay with Ms. Green in any circumstances; is that correct?
* * *
MR. MOORE: Yeah. If I-if I didn't agree with her and voted otherwise, yeah, I'd be fine.
* * *
The defendant moved to disqualify Moore as a juror for cause. Specifically, the defendant argued:
[DEFENSE COUNSEL]: Your Honor. I think that based upon his questioning here and during the general panel, he indicated that he has some knowledge of the case, he's overheard police talk, he's been a police officer or a sheriff's deputy for 35 years and he indicated that he wants to believe that he can be a fair and impartial juror.
And I think that-given the gravity of this situation, I think that that places him a little bit too close to the fire on this case. He's also indicated that in his years-and as he understood that there had been the allegation of flight in this case, he'd come to a conclusion. Now he didn't want to go so far when I asked him about the steps between A to Z, he said he hadn't reached a final conclusion on it, but he's come to some conclusions and I think the Court was able to observe this demeanor when those questions were asked to him both by myself and by the State.
So for that reason, we don't think that he can be a fair and impartial juror on this case.
The state responded as follows:
[THE STATE]: Your Honor, during the State's portion of voir dire with Mr. Moore, he was unequivocal when asked if he could render a decision based only on the facts and evidence presented. I did a lengthy inquiry as to his background in law enforcement and asked him if he would be able to set aside that experience in order to be a fair and impartial juror and render a verdict based only on the facts and evidence.
He never hesitated. He agreed that he could. He was firm and did not waver. As far as the individual voir dire portion, Your Honor, he indicated again that he could base his verdict only on the facts and evidence. He certainly willingly and freely admitted that he had seen newspaper accounts and various news reports and that there had been police talk, but interestingly enough, Your Honor, that fact that he said what he gleaned from those reports and the police talk, were simply that a woman had been killed and that the defendant had been accused of it and that he had fled.
*1285 A number of other jurors, Your Honor, also indicated that they had had that information and despite having that information, Mr. Moore was still able to say that he would render a verdict based only on the facts and evidence. And as far as the flight inquiry that defense counsel engaged in, Mr. Moore said specifically that he would not render a decision based solely on the fact that the defendant fled.
He may consider it and the law says that he and any other juror may consider flight as evidence of guilt. So that, in and of itself, is certainly nothing that would provide a proper basis to strike him for cause. So because Mr. Moore has indicated time and time again that he could render a decision based only on the facts and evidence and that he has not reached a conclusion as to the defendant's guilt, then we urge the Court to deny the defendant's motion to strike him for cause.
The trial court denied the defendant's motion, stating as follows:
Mr. Moore indicated that he can be fair and impartial and that he had not drawn any conclusions, that he could follow the law and in addition that the relationship or lack thereof of seeing the state employee every day will not affect his decision.
Considering the totality of the voir dire record and Moore's answers, we find that the trial court did not abuse its discretion in denying the defendant's challenge for cause. The trial judge was in a position to view Moore's demeanor and tone. It is clear that the trial court believed that Moore would be impartial and could follow the law. Moore's association with the SPD ended approximately five years prior to the trial, he stated that he had no personal knowledge of the case, and he insisted that he could be impartial despite his law enforcement background. Although Moore's job responsibilities at the courthouse were not fully developed by either party, he stated that his interaction with Ms. Green was nominal, as he saw her sometimes walking to and from her vehicle in the courthouse parking lot. Further, Moore explicitly stated that he would have no problem rendering a decision against the state if the facts warranted such a decision. While Moore stated that he believed that fleeing was an indication of guilt, he insisted that fleeing, alone, did not mean that a defendant was guilty, but that it must be considered as a factor, in light of the circumstances of each particular case. Moore's statement was consistent with the law provided to the jury at the close of the case. Accordingly, this assignment of error is without merit.
Denial of Motion to Continue Trial
The defendant also contends the trial court erred in allowing his case to proceed to trial when it was made known that there was supplemental discovery which defense counsel had not received until he went to check the record in the clerk's office during voir dire. Specifically, the defendant complains that the state failed to serve him with a copy of its "Supplemental Response to Defendant's Motion for Discovery" (the "supplemental response") prior to trial, prejudicing his defense and denying him due process of law. According to the defendant, the supplemental response indicated that DNA swabs had been recovered from the suspected murder weapon and sent to the crime lab for analysis. He maintains that his attorney discovered the supplemental response in the clerk of court's records prior to jury voir dire of the fourth jury panel and that he immediately brought the matter to the attention of the trial court, which failed to rule on the matter. The defendant argues that a DNA analysis of suspected blood recovered from the murder weapon may have provided exculpatory evidence and, therefore, *1286 the trial court should have continued the trial to allow the defense the opportunity to analyze the "newly discovered" DNA evidence.
Due process requires the disclosure of evidence that is both favorable to the accused and material either to guilt or punishment. Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). When such information is not disclosed and it is material in that there is a reasonable probability that if the evidence had been disclosed, the results of the trial would have been different, constitutional error occurs and the conviction must be reversed. Kyles v. Whitley , 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ; United States v. Bagley , 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ; State v. Green , 2016-0107 (La. 6/29/17), 225 So.3d 1033, cert. denied , --- U.S. ----, 138 S.Ct. 459, 199 L.Ed.2d 338 (2017). The late disclosure of such evidence may also require a reversal if the timing significantly impacted the defendant's opportunity to effectively utilize the material. However, a defendant shows no entitlement to relief if the information was available to him through other means by the exercise of reasonable diligence. State v. Green , supra ; State v. Kemp , 2000-2228 (La. 10/15/02), 828 So.2d 540.
The evidence of record reveals that the state's first discovery responses, which were provided to the defense on or about January 21, 2015, disclosed that DNA swabs of suspected blood from the Colt .45 handgun had been sent to the crime lab. The supplemental response, which according to the attached certificate of service was provided to the defense on February 17, 2017, identified a certified lab report listing evidence the state may offer into evidence as proof of certification in conformity with La. R.S. 15:499 -501.[19] The certified lab report identified, in pertinent part, that on September 18, 2014, Tiffany Davis, of the crime lab, received for analysis "one sealed paper bag containing one swab carton containing two swabs from pistol sn# DR31076," and "one sealed paper bag containing one swab carton containing two swabs of suspected blood from pistol sn# DR31076." As represented by the state in the hearing, the report reflects that the crime lab was unable to analyze the DNA samples because an analysis requires the "submission of reference/elimination samples from all persons identified in this investigation. The samples are required for DNA comparison purposes."
The state did not attempt to submit the lab report and represented to the trial court that the DNA was not analyzed because the defendant's claim that the shooting was in self-defense removed identity as a contested issue in the trial. Despite the defendant's contention, the record reflects that defense counsel received notice of the existence of the DNA swabs of suspected blood found on the gun several months before trial, and had ample opportunity before trial to have the swabs analyzed. In fact, the defendant submitted a copy of the crime lab's evidence receipt of the DNA swabs, provided to the defense in the state's 2015 discovery responses, as his "Exhibit 1." Accordingly, we find that the defendant's contention *1287 that he was denied due process of law because the state failed to give him notice of the existence of DNA swabs of suspected blood taken from the murder weapon, or because the trial court did not continue the trial so that the defense could test the DNA, is without merit.
Chain of Custody
Next, the defendant contends the trial court erred in allowing the state to introduce evidence at trial without having first established a complete chain of custody. He argues that Exhibit 12, a .45 Hornaday shell casing found in the laundry room of Godley's house, was introduced into evidence during the testimony of Det. Mitchell. According to the defendant, the shell casing was erroneously admitted into evidence because the state failed to establish a proper chain of custody prior to its admission.[20] Specifically, the defendant complains that Exhibit 12 contained no written chain of custody, signed by the person who received the evidence, and therefore, was inadmissible.
To admit demonstrative evidence at trial, the law requires that the object be identified, either by testimony that the object is related to the case or by chain of custody, that is, by establishing the custody of the object from the time it was seized to the time it was offered in evidence. State v. Drew , 360 So.2d 500 (La. 1978) ; State v. Toney , 26,711 (La. App. 2 Cir. 3/1/95), 651 So.2d 387. It is not necessary that the evidence as to custody eliminate all possibilities that the object has been altered. The state need only establish, by a preponderance of the evidence, that the object is the one connected with the case. State v. Toney , supra.
A defect in the chain of custody goes to the weight of the evidence rather than to its admissibility. State v. Booker , 46,256 (La. App. 2 Cir. 5/18/11), 70 So.3d 818 ; State v. Holden , 45,038 (La. App. 2 Cir. 1/27/10), 30 So.3d 1053, writ denied , 2010-0491 (La. 9/24/10), 45 So.3d 1072 ; State v. Henton , 28,576 (La. App. 2 Cir. 9/25/96), 682 So.2d 777, writ denied , 1996-2590 (La. 3/27/97), 692 So.2d 391. For the admission of demonstrative evidence, it suffices if the foundation laid establishes that it is more probable than not that the object is the one connected with the case. State v. Anderson , 554 So.2d 133 (La. App. 2 Cir. 1989) ; State v. Toney , supra ; State v. Daniels , 614 So.2d 97 (La. App. 2 Cir. 1993), writ denied , 619 So.2d 573 (La. 1993).
During the testimony of Det. Mitchell, the following exchange took place:
[THE STATE]: Detective Mitchell, I'm showing you what we've marked for identification purposes only as State's Exhibit 12. Take a look at it sir, and tell me if you recognize it. And, if you do, how so?
[DET. MITCHELL]: This particular item features, again, a label written in my handwriting that doesn't appear to be altered. It identifies the contents of the bag as a .45 caliber Hornady brand cartridge collected from [Godley's *1288 house]. And the location within the residence is listed as the laundry room floor.
[THE STATE]: Could you open that, sir, and tell me what's inside?
[DET. MITCHELL]: Yes. Inside this bag is also a .45 caliber Hornady brand cartridge casing.
[THE STATE]: Your Honor, at this time, we seek to offer, file, and introduce into evidence State's Exhibit 12.
THE COURT: Any objection, Mr. Joseph?
[DEFENSE COUNSEL]: Actually, your Honor, I do object. I'm noticing that on all of them there's no chain of custody signed by anybody in terms of them being received. On item 10, on item 11, and on item 12.
[DET. MITCHELL]: In reference to that point, at the [SPD] we don't handwrite chain of custody into our labels. That is held through our computer. We have a computer-generated program that maintains our chain of custody records.
[DEFENSE COUNSEL]: I think I need to see that.
[THE STATE]: In response to that, chain of custody doesn't go to the admissibility issue. It goes to the weight of the evidence. And accordingly, the officer testified that he was the one who seized these items, so the chain of custody is actually complete based on his testimony. These are things that he had taken from the crime scene, so the chain of custody is complete.
* * *
We find that the record supports the trial court's finding that Exhibit 12 was admissible. The state, through the extensive testimony of Det. Mitchell, laid a sufficient foundation for the admission of Exhibit 12 by identification, and by establishing that it is more probable than not that the Hornady shell casing was connected with this case. See State v. Toney , supra. Hornady bullets and shell casings were found throughout the house, and the murder weapon was loaded with Hornday brand bullets. The detective testified that he identified, collected, tagged and placed the casing in a bag at the scene of the crime. He identified the handwriting on the label as his own. Further, as the state noted during its argument to the trial court, the defendant admitted that he shot Godley. Therefore, the ownership and identity of the gun and shell casings were not at issue during the trial. This assignment lacks merit.
Admissibility of Crime Lab Certification
Further, the defendant contends the trial court erred in sustaining the state's objection to the admission of the crime lab analyst's certification provided in the state's supplemental response (discussed above). During Det. Mitchell's cross-examination, defense counsel questioned him about the document's reference that the DNA swabs of suspected blood from the suspected murder weapon were received from him (Det. Mitchell). Thereafter, defense counsel attempted to enter the document into evidence. The state objected on the basis that the certification was "a mere copy," and Det. Mitchell could not authenticate the document because he did not prepare it. According to the defendant, La. R.S. 15:499 et seq. provides that the crime lab certification is self-authenticated, and, therefore, its admissibility is not contingent upon a foundation being laid through witness testimony.
La. R.S. 15:500 provides, in pertinent part:
In all criminal cases * * * the courts of this state shall receive as evidence any certificate made in accordance with R.S. 15:499 subject to the conditions contained in this Section and R.S. 15:501. The certificate shall be received in evidence *1289 as prima facie proof of the facts shown thereon, and as prima facie proof of proper custody of the physical evidence listed thereon from time of delivery of said evidence to the facility until its removal therefrom.
(Emphasis added).
La. R.S. 15:499 provides that criminal laboratories are authorized to provide proof of examination and analysis of physical evidence by providing a certificate of the person in charge of the facility. The party introducing a certificate of analysis under La. R.S. 15:499 must provide written notice of intent to offer proof by certificate at least 45 days prior to trial. La. R.S. 15:501. State v. Cunningham , 2004-2200 (La. 6/13/05), 903 So.2d 1110 ; State v. Clark , 47,424 (La. App. 2 Cir. 10/3/12), 107 So.3d 644, writ denied , 2012-2595 (La. 5/3/13), 113 So.3d 210. "The party," referenced in La. R.S. 15:501, applies to either the state or the defendant. State v. Cunningham , supra.
We find that the trial court did not err in sustaining the state's objection to the admission of the crime lab analyst's certification. To the extent that the certificate complied with La. R.S. 15:499, the admission of the certificate was not mandated by La. R.S. 15:500 because the defendant failed to notify the state, as required by La. R.S. 15:501, that he intended to use the certificate in lieu of live testimony.[21]
Further, the failure to admit the certificate at defendant's request was harmless error. Pursuant to La. R.S. 15:499, to be admissible, the certificate must identify the results of the examination or analysis. The certificate sought to be introduced into evidence merely provided that the DNA evidence submitted to the crime lab was not analyzed. The fact that DNA evidence was submitted to the crime lab (but not analyzed) was not relevant to the case because the state did not submit any DNA evidence and defendant did not dispute that he was the shooter. Accordingly, this assignment of error is without merit.
CONCLUSION
For the reasons set forth herein, we affirm the defendant's conviction and sentence.
CONVICTION AFFIRMED; SENTENCE AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, MOORE, PITMAN and GARRETT, JJ.
Rehearing denied.

State v. Prieur , 277 So.2d 126 (La. 1973).

The court stated, "After considering the testimony, arguments of counsel and the applicable law[,] the Court finds that the evidence meets the statutory requirements and is therefore admissible."

The photographs of the crime scene and guns were admitted into evidence without objection.

A computer-generated diagram of Godley's house was displayed to the jury. During his testimony, Det. Mitchell pointed to the area where the bullet hole and blood splatter were found on the wall in the kitchen. He also showed the locations where the guns, shell casings, handbag and body were found.

During Det. Mitchell's testimony, the following items were admitted into evidence: the Colt .45; the spent .45 Hornady shell casings; the spent bullet collected from the kitchen wall; the deformed bullet found near the laundry room; and the spent bullet that was removed from Godley's body during her autopsy.

At trial, Johnson testified that the defendant often told him that he would flee the country if "anything bad" happened, but he never specified that he would flee to Mexico. Johnson admitted that he had heard the defendant make the statement numerous times over their 35-year friendship. However, he believed that the statement was made in jest.

The photographs and other documentation of the defendant's entrance into Mexico were admitted into evidence and shown to the jury.

The defendant's truck was also turned over to the U.S. authorities.

A recording of the interview was admitted into evidence and played for the jury.

The autopsy report reveals that this gunshot wound entered Godley's "lateral upper left arm" and exited her "upper left back."

The detailed records from White's investigation were introduced into evidence and were displayed for the jury.

On appeal, the defendant did not specifically address any lack of similarities between the 2011 domestic incident with Godley and her shooting. However, in the Prieur hearing, the defense implied a lack of similarity with the 2011 incident because it involved a knife rather than a gun.

See State v. Altenberger , supra (evidence of the "defendant's pattern of domestic abuse goes directly to rebut defenses defendant may raise at trial and demonstrates their independent relevancy besides merely painting defendant as a bad person"); State v. Rose , supra (evidence that the defendant previously physically abused the victim was admissible to show motive for her murder and to demonstrate the volatile nature of their relationship); State v. Walker , 394 So.2d 1181 (La. 1981) (evidence that defendant and victim had a volatile relationship and that defendant had a bad temper was relevant to show the commission of the offense, intent and motive); State v. Howard , supra (this Court affirmed the trial court's admission of past acts of domestic violence against the defendant's prior girlfriend as tending to prove motive or pattern of domestic violence); State v. Hunter , 2015-0306 (La. App. 4 Cir. 9/9/15), 176 So.3d 530 (prior instances of violence between the couple were admissible to establish motive and to rebut the defendant's claim that he stabbed the victim in self-defense).

See State v. Reed , supra (the trial court did not err in admitting evidence of the defendant's batteries of his previous girlfriends to show intent); State v. Galliano , supra (the trial court did not err in admitting evidence that the defendant broke another baby's arm while pulling the baby from its car seat to show absence of mistake or accident); State v. Monroe , 364 So.2d 570 (La. 1978) (the trial court did not err in admitting evidence that the defendant pled self-defense to a previous murder charge as it negated the defendant's claim of self-defense); Hippler v. Guilbeau , 1998-1914 (La. App. 3 Cir. 12/16/98), 722 So.2d 133 (the trial court erred in excluding the testimony of prior acts of violence against women other than the plaintiff).

A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A). The possibility of retreat may not be considered as a factor in determining whether or not the defendant had a reasonable belief that deadly force was reasonable and apparently necessary. La. R.S. 14:20(D).
When the defendant claims self-defense, the state has the burden to prove beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Allen , 50,703 (La. App. 2 Cir. 8/10/16), 200 So.3d 376, writ denied , 2016-1734 (La. 9/6/17), 224 So.3d 981 ; State v. Lensey , 50,242 (La. App. 2 Cir. 11/18/15), 182 So.3d 1059, writ denied , 2015-2344 (La. 3/14/16), 189 So.3d 1066 ; State v. Edwards , 49,635 (La. App. 2 Cir. 2/26/15), 162 So.3d 512, writ denied , 2015-0628 (La. 2/5/16), 186 So.3d 1163. Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. State v. Thomas , 43,100 (La. App. 2 Cir. 4/30/08), 981 So.2d 850, writ denied , 2008-1276 (La. 2/6/09), 999 So.2d 769 ; State v. Spivey , 38,243 (La. App. 2 Cir. 5/12/04), 874 So.2d 352. The use of deadly force against an unarmed victim, even in the midst of a physical altercation, may be an excessive use of force. State v. Edwards , supra ; State v. Ingram , 45,546 (La. App. 2 Cir. 6/22/11), 71 So.3d 437, writ denied , 2011-1630 (La. 1/11/12), 77 So.3d 947 ; State v. Fields , 38,496 (La. App. 2 Cir. 6/23/04), 877 So.2d 202, writ denied , 2004-1865 (La. 11/24/04), 888 So.2d 229.
A person who is the aggressor or who brings on a difficulty cannot claim self-defense, unless he withdraws from the conflict in good faith. La. R.S. 14:21. Not only must the aggressor withdraw from the conflict, but the withdrawal must be in such a way that the other person "knows or should know" of the desire to withdraw. State v. Edwards , supra. If the aggressor's withdrawal is not made sufficiently known to his adversary, he is not eligible to claim the justification of self-defense for the homicide. Id.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances and the actions of the defendant. State v. Mickelson , 2012-2539 (La. 9/3/14), 149 So.3d 178 ; State v. Walker , 51,217 (La. App. 2 Cir. 5/17/17), 221 So.3d 951. Specific intent may be formed in an instant. State v. Mickelson , supra ; State v. Washington , 50,424 (La. App. 2 Cir. 3/16/16), 188 So.3d 350, writ denied , 2016-0718 (La. 4/13/17), 218 So.3d 119.
The discharge of a firearm at close range at a person is indicative of a specific intent to kill or inflict great bodily injury upon that person. State v. Lloyd , 48,914 (La. App. 2 Cir. 1/14/15), 161 So.3d 879, writ denied , 2015-0307 (La. 11/30/15), 184 So.3d 33, cert. denied , --- U.S. ---- 137 S.Ct. 227, 196 L.Ed.2d 175 (2016) ; State v. Farris , 51,094 (La. App. 2 Cir. 12/14/16), 210 So.3d 877, writ denied , 2017-0070 (La. 10/9/17), 227 So.3d 828. Specific intent to kill may also be inferred from the extent and severity of the victim's injuries and from the defendant's use of a deadly weapon to produce those injuries. State v. Washington , supra. The determination of whether the requisite intent is present is a question for the trier of fact. State v. Washington , supra ; State v. Walker , supra ; State v. Allen , 41,548 (La. App. 2 Cir. 11/15/06), 942 So.2d 1244, writ denied , 2007-0530 (La. 12/7/07), 969 So.2d 619.

See State v. Bordenave , 1995-2328 (La. 4/26/96), 678 So.2d 19 ; State v. Charleston , 33,393 (La. App. 2 Cir. 6/23/00), 764 So.2d 322, writ denied , 2000-2603 (La. 9/14/01), 796 So.2d 672.

See e.g. , State v. Williams , 2016-1192 (La. App. 4 Cir. 10/18/17), 2017 WL 4700384, and State v. Curington , 2009-867 (La. App. 5 Cir. 10/26/10), 51 So.3d 764, 771, writ denied , 2010-2612 (La. 4/8/11), 61 So.3d 684 (the courts held that since the defendants did not timely raise an objection to the admission of "other crimes" evidence without a limiting jury instruction, they are precluded from raising the issue on appeal).

La. R.S. 15:499 et seq . provides that an analyst's certificate, if it complies with the requirements of the statute, and proper notice is provided, may be admitted in lieu of an analyst's live testimony if no timely written demand is filed. State v. Simmons , 2011-1280 (La. 1/20/12), 78 So.3d 743 ; State v. Clark , 47,424 (La. App. 2 Cir. 10/3/12), 107 So.3d 644, 653, writ denied , 2012-2595 (La. 5/3/13), 113 So.3d 210. Likewise, where timely written demand is filed, a certificate has no evidentiary value and the state must call the relevant witnesses to prove its case. State v. Cunningham , 2004-2200 (La. 6/13/05), 903 So.2d 1110.

The defendant's argument also seems to suggest that Exhibits 10 (the Colt .45 handgun) and 11 (a .45 Hornaday shell casing recovered from Godley's laundry room) were also admitted in error due to the state's failure to establish the proper chain of custody. During the trial, the defense objected to the state's admission of Exhibit 12 on the basis that the state had not first established a chain of custody. However, the defense did not contemporaneously object to the admission of Exhibits 10 and 11. In fact, when Exhibits 10 and 11 were offered into evidence, defense counsel responded, "No objection, Your Honor." Rather, after the admission of Exhibits 10 and 11, the defense complained that they had been admitted in error. Det. Mitchell testified that he retrieved the items at the crime scene, labeled them and placed them in bags. See La. C. Cr. P. art. 841.

While defendant did not provide notice of his intent to use the crime lab analyst's certification, the state provided such notice, although untimely. However, the state did not seek to introduce the certificate at trial. See La. R.S. 15:501(A).