■CARAWAY, J.
ItQuennel Washington was charged by bill of information with one count of armed robbery and one count of attempted second degree murder. Following a jury trial, Washington was found guilty as charged on both counts and subsequently adjudicated a' second felony offender. He received concurrent sentences of 55 years at hard labor without benefits on the arined robbery conviction, and 45 years at hard labor without benefits for the attempted second degree murder conviction. Washington appeals his convictions and sentences. We affirm.

Facts

On May 24, 2013, as Kenneth Berry was working as a store manager at a dollar store in Shreveport, Louisiana, he took his usual cigaretté break at approximately 1:00 p.m. on the front sidewalk of the store. Berry finished his cigarette and heard someone running fast toward him. As Berry turned to see what was going on, a man was abruptly on top of him. Berry could tell it- was a black man wearing a *354 green hooded sweatshirt (“hoodie”). Berry was only able to see the man’s eyes, because the man’s face was covered with a bandana. 'While the man was on top of him, Berry testified that the man stated, “Take that, mother fucker,” and Berry fell face down onto the concrete sidewalk. Berry was unable to move or to feel any part of his body, except for the “incredible pain sensation” in his neck. Berry could also see a considerable amount of blood flowing, from his face. The pain and blood were the result of a stab wound caused by a knife partially penetrating Berry’s spine. He was rendered quadriplegic from the Uattack. Berry did not see the man again, but did hear his footsteps running past him after the'robbery.
After attacking Berry, the man quickly ran into the store, where Shamona Cooper was working as a cashier. The man demanded that Cooper give him the cash out of the cash register, swung a knife at Cooper, and told her, “Bitch, give me the money,” After grabbing something to scan, Cooper was able to open the register. The man told Cooper to place the money in a hat he was holding. After Cooper threw the money into the hat, the man quickly, left the store. According to Cooper, the robber was wearing a hood with something covering his face, blue jeans, and gloves. Cooper ran out of the store screaming Berry’s name. She found him on the ground stabbed and bleeding from the head. Cooper then went back into the store to call''911.
A ^customer in the store also witnessed the events.. She essentially corroborated Cooper’s version of the events point for point. The customer added that the man was holding a kitchen knife next to Cooper’s side and that as Cooper struggled to get cash from the register, the man threatened to stab the cashier. The customer eventually ran out the front door of the store and assisted Berry.
Because witnesses in the parking lot saw the robber flee toward the north side of the building, police searched a wooded area behind the store where they found a green hoodie, black jeans, ball cap,' tennis shoes, a kitchen knife and skull cap with money in it. Police also conducted DNA analysis on drops of blood left by the robber on the floor of the store. When Uthe blood did not match the victim, the DNA profiles generated were placed into the Combined DNA Index System by crime lab personnel. On August 1, 2013, police received information that a DNA match between the blood and Quennel Washington had been found. Police arrested Washington and obtained a DNA sample from him. On August 2, 2013, police showed Cooper a six-person photographic line-up from which she identified Quennel Washington as the robber.
A unanimous jury found Washington guilty of attempted second degree murder and armed robbery. Washington filed a motion for post-verdict judgment of acquittal which was denied. He was subsequently adjudicated a second felony offender based upon the armed robbery conviction and received concurrent sentences of 55 years at hard labor without benefits for that offense and 45 years at hard labor without benefits for the attempted second degree murder conviction. After the denial of a motion to reconsider his sentences, this appeal ensued. On appeal, Washington raises three assignments of error, including insufficiency of the evidence to convict him, issues relating to an invalid jury verdict and excessive sentencing.

Discussion

In his first assigned error, Washington claims that the eyewitnesses’ identification and DNA match are insufficient to prove he committed the crimes beyond a reason *355 able doubt. Further, Washington claims that the state failed to prove intent to kill, an essential element of attempted second | ¿degree murder, because Berry was not his intended target and his threats to the victim were inadequate to establish the necessary intent.
When issues are raised on appeal, both as to the sufficiency of evidence'and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Lewis, 48,373 (La.App.2d Cir.9/25/13), 125 So.3d 482.
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), appellate courts review the record in the light most favorable to the prosecution to determine whether the evidence was sufficient to convince any rational trier of fact that all the essential elements of the crime had been proven beyond a, reasonable doubt. State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 09-0310 (La.11/6/09), 21 So.3d 297.
It is the function of the trier of fact to assess credibility and resolve conflicting testimony. State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La.1993); State v. Bonnett, 524 So.2d 932 (La.App. 2d Cir. 1988), writ denied, 532 So.2d 148 (La.1988). The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A Previewing court accords great deference to a factfinder’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d. 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913; State v. Price, 48,986 (La.App.2d Cir.5/15/14), 140 So.3d 1212, writ denied, 14-1274 (La.2/6/15), 158 So.3d 814.
Washington was charged with armed robbery in violation of La. R.S. 14:64, which provides:
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by tise of force or intimidation, while armed with a dangerous weapon:
Washington was also charged with attempted second degree murder, a violation of La. R.S. 14:30.1 and La. R.S. 14:27. La. R.S. 14:30.1 provides in pertinent part that:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm.
La. R.S. 14:27 provides in pertinent part that:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit .the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
Although the statute for the completed crime of second degree murder allows for a' conviction based on specific intent to kill or to inflict great bodily harm, a conviction for attempted second degree murder requires proof of the spe *356 cific intent to kill. State v. Bishop, 01-2548 (La.01/14/03), 835 So.2d 434; State v. Murray, 49,418 (La.App.2d Cir.1/14/15), 161 So.3d 918. Thus, to convict Washington of armed robbery, the state was required to prove: (1) a taking (2) of anything of value (3) from the person or in the immediate control of another (4) by the use of force of intimidation (5) while armed with a dangerous weapon. To convict Washington of attempted second degree murder the state must prove that Wash: ington: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim’s death.
The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Fields, 42,761 (La.App.2d Cir.1/9/08), 973 So.2d 973, writ denied, 08-0469 (La.9/26/08), 992 So.2d 983. Specific intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. State v. Allen, 41,548 (La.App.2d Cir.11/15/06), 942 So.2d 1244, writ denied, 07-0530 (La.12/7/07); 969 So.2d 619. Specific intent need not be proved as a fact; it may be inferred from the circumstances of the transaction and the defendant’s actions. Bishop, supra. Specific intent to kill can be inferred from the intentional use of a deadly weapon such as a knife or a gun. Fields, supra. Specific intent to kill may also be inferred from the extent and severity of the victim’s injuries, and the defendant’s use of a deadly weapon to produce those injuries, which involved serious risk of death. State v. Deweese, 13-293 (La.App. 5th Cir.10/30/13), 128 So.3d 1186.
[7At trial, Berry testified to the facts as noted above. He added that the man approached him from his right side, going from south to north. He stated that on the morning of the incident, there was no blood on the floor of the store. In court, Berry identified Washington as the man who stabbed him. He admitted that hé based his identification on the fact that he had previously seen Washington in the store as a customer. Berry also' identified a photograph of a green hoodie as being the. one worn by the man who attacked him.
Cooper also testified at trial and recounted her experience at the store as noted above. She explained that part of her responsibilities was to keep the store clean so she knew that there was no blood on the floor before the robbery. Cooper also testified that the store had approximately six surveillance cameras. She had reviewed the surveillance video depicting the robbery and confirmed that it accurately pictured the events. She also identified as accurate photographs taken of the crime scene admitted into evidence. Specifically Cooper identified photographs showing the hat she placed the money in and the knife used in the robbery found by police near the scene. Additionally, the green hoodie was identified by Cooper as the one worn by the robber. Cooper stated that Washington had been a regular in the store, and actually came into the store to purchase something the morning of the robbery. She identified Washington as the robber in open court.
Patrol Supervisor Joseph Dews testified that he responded to the robbery. He and another officer walked toward a trail in the local woods|snear the store and discovered “three or four different locations of items” throughout the trail that included a green hoodie, ball cap, tennis shoes, black pants, white t-shirt, skull cap, a kitchen knife and a large sum of cash. From photographs of *357 the items introduced into evidence, Dews identified the items he discovered.[1]
Corporal Tracy Mendels, certified crime scene investigator with the Shreveport Police Department, testified that she' also attended the crime scene. She went inside the store and immediately saw drops of blood not far from the front door,' adjaceht to the cash register. She took photographs of the blood drops as well as DNA samples which were transported to the crime lab. Mendels testified that the blood drops were “fresh” and had not been there that long because they were still wet. She identified the photographs she took -of the blood that were introduced, into evidence. Mendels also collected three surveillance videos that depicted the crime. She watched the videos and testified to their contents. While watching the surveillance footage of the robbery, which was published to the jury in open court, Mem-dels observed blood dripping from the robber’s hands and testified as follows:
I watched the video all the way through, and there was going to be a ’camera angle right at the register pointed — it’s going to be in a west direction,, towards the front door. And on the floor, you can see that the floor is clean. And the person, the suspect comes in. He’s masked, gloved, and he has something in his hands. And at one point, he wields the knife at the female. She scans what ended up being the toilet paper across the scanner to open the register, and she 19moves back, like, for him .to get the money. And I don’t know what was said or what was done, but he held out the item that was in his hands, and she pulled the money out of the register to put in .... when that occurred, you can actually see on the video ... possible blood dripping off of him directly on the ground right where he’s standing. You can see it ... As. soon as he put the hands out, it dripped right down.[2] •
Mendels also stated that she obtained a DNA sample from Berry because there was a possibility that the blood came from him. According to Mendels, obtaining the sample could eliminate the victim and help to determine the identity of the robber.
Dr. Candace Jones of the North Louisiana Crime Lab was able to obtain a DNA profile from the blood spot in front of the cash register which she identified in court. She testified that the blood was inconsistent with Berry’s and excluded him as the person whose blood was found on the floor of the store. However, Washington’s DNA was consistent, or a match, to the blood drop. Dr. Jones stated that “the probability of'finding the same DNA profile, if the DNA had come from a randomly selected individual other than Quennel Washington, was approximately one in 3.58 quadrillion.” '
Sergeant Jack Miller was the lead investigator of the robbery. He interviewed Cooper and eventually determined that $376 dollars had been taken from the cash register. Although evidence of the robber was found in the wooded area behind the store, Miller was unable to immediately determine his identity. Sergeant Miller eventually received information that led to the arrest of Washington on August 1, 2013. Miller then obtained I mtwo refer *358 ence swabs from Washington’s mouth. On August 2, 2013, Miller was able to prepare a photographic lineup which he showed to Cooper. She identified Washington as the perpetrator.
At the police station on the date of his arrest, Washington asked Sergeant Miller to take his handcuffs off so that they could, talk one on one, which was a customary practice. As soon as Sergeant Miller took the second handcuff off, Washington tried to incite a physical altercation with Sergeant Miller by “stepping into his space” and rising into a fighting stance. Sergeant Miller testified that “he knocked him to the ground, and ... immediately handcuffed him back up.” Sergeant Miller reported that Washington was told that was a stupid thing to do, to which Washington replied, “I deserve to go to jail. I can’t be on the street. I’m a monster.”
After Miller’s testimony, both the state and defense rested.
When viewed in the light most favorable to the state, we find the evidence sufficient to convict Washington for. both charged offenses. . If believed, the. evidence establishes that Berry and Cooper were each confronted within seconds of one another by the same black masked man who was armed with a large kitchen knife, That the man used that , knife to stab Berry is evidenced by the devastating wounds he received. Thereafter, the video surveillance shows the masked man entering the store and confronting Cooper while she worked the cash register. Cooper recalled that the robber was a man who was in the store earlier that day. Both Cooper and an eyewitness heard the perpetrator . threaten Cooper with the knife and demand money. Cooper identified Washington as her robber from [ua six-person photographic lineup and .in open court. Although Berry only saw his attacker’s eyes, he was able to identify Washington as his attacker because he had seen him in the store on previous occasions. The most persuasive proof of Washington’s identity as perpetrator of the offenses, however, was that portion of the video surveillance showing blood falling from the hand of the robber onto the floor of the store. The DNA samples of that blood matched Washington’s DNA. From this evidence, the jury could have reasonably determined that the state had proven that Washington was the perpetrator of the subject offenses. .
Moreover, Washington’s argument that the evidence failed to prove he possessed the necessary specific intent to kill is without merit. Regardless of Washington’s knowledge' of Berry’s presence in the front of the store, his barbaric use of a knife by jumping on top of Berry arid cutting him' behind the neck coupled with his threatening language is sufficient evidence from which the trier of fact could infer a specific intent to kill. The evidence established that Washington severed Berry’s spine and left him on the sidewalk in a pool of blood, unable to move or feel any part of his body. Berry is now a quadriplegic as the result of the incident. Under these circumstances, the record supports a jury finding that Washington had the specific intent to kill Berry. This assignment of error is without merit.
In his second assignment of .error, Washington argues that his conviction should be set aside and a new trial ordered because the jury verdict was not signed on the back and the form was signed next to both guilty as charged and not guilty. Specifically, Washington contends that the Injury, verdicts were not written on the back of the responsive verdict form as mandated by La.C.Cr.P. art. 810, and on their face are ambiguous. He also asserts that the November 21, 2014 special hearing in which the foreman clarified the ver- *359 diets is impermissible, and that the--error requires the convictions to be set aside and remanded for a new trial.
On November 19, 2014, after the jury-found Washington guilty of armed robbery and attempted second degree murder, the jury foreman handed the bailiff the two verdict forms, and the bailiff gave them verdict forms to the court. The trial court reviewed both forms and took note of the foreman’s signature at the top of the forms next to guilty as charged as to attempted second degree murder and armed robbery. The trial court did not detect or notice that the foreman had also signed the bottom of both forms next to not guilty. The clerk also did not detect the discrepancy. The clerk asked the jury as a group if their verdicts were guilty as charged to attempted second degree murder and armed robbery, and the jury responded, “yes.” Upon the request of Washington,-.the jury was polled and each juror answered “yes” to guilty as charged being their, verdict on both counts. - It was therefore revealed that the jury voted unanimously on ¡both counts. However, after the verdicts-were received by the court and the jurors were excused, the clerk noticed that the jury foreman placed his signature on the jury verdict forms next to two possible verdicts, “guilty as charged” and “not guilty.”
On November 21, 2014, at the agreement of counsel, a special hearing was held with the foreman to explain the discrepancy. During the | , shearing, the foreman testified that he signed by the “not guilty” in error, and that his intent and the juryes intent was to find Washington guilty as charged on both counts. He specifically testified that he, got confused-when the forms were sent back to him after he sent them to the bailiff, and assumed the bailiff wanted him to sign at the bottom of the page. No ruling by the court was made at this time.
La.O.Cr.P, art. 810 provides in pertinent part that:
When a verdict has been agreed upon, the foreman shall write the verdict on the back of the list of responsive verdicts given to the jury and shall sign it. There shall be no formal requirement as to the language of the verdict except that it shall clearly convey the intention of the jury.
When a verdict is ambiguous, the intent of the jury can be determined by reference to the pleadings, the evidence, the admissions of the parties, the instructions, and the forms of the verdicts submitted. State v. Williams, 386 So.2d 1342 (La.1980); State v. Anderson, 07-752 (La.App. 5th Cir.2/6/08), 979 So.2d 566. If any uncertainty exists in the language actually used, the first object of the appellate court in construing the verdict is to ascertain with reasonable certainty the intention of the jury. State v. Broadnax, 216 La. 1003, 45 So.2d 604 (1950). The jury’s acknowledgment in open court controls any divergent verdict inscription. State v. Perry, 612 So.2d 986 (La.App. 2d Cir.1993).
In this case, the jury foreman improperly wrote the verdicts on the front of the forms instead of on the back as required by La.C.Cr.P. art. 810. However, strict adherence to the statutory form of a verdict usually is not required; although the verdict is informal, if the intention of the jury to |14return a verdict of guilty or not guilty of the offense charged may be understood readily, it is sufficient. State v. Campbell, 97-369 (La.App. 5th Cir.11/25/97), 703 So.2d 1358. Thus, in this matter, the jury foreman’s signing the front of a jury verdict form instead of the back is not an error that requires reversal or remand.,
The central issue is whether the jury foreman’s signing of his name by “guilty” *360 and “not guilty,” along with the polling of the jury, clearly conveys the intention of the jury. La.C.Cr.P. art. 810. We find no reversible error in these circumstances. The trial court realized the discrepancy in the forms after the jury verdicts were received and the jurors were excused. Although Washington argues that after a trial has concluded, the clarification of a verdict is not permissible, the record shows that the hearing was not about clarifying the verdict, but about understanding why the jury foreman signed in two places. Indeed, Washington’s attorney noted that the jury voted guilty on both counts with reasonable certainty and conceded that the issue was not about an invalid verdict or one the Court should refuse. Ultimately, the transcript of the trial plainly shows that the jury voted unanimously for guilty as charged on both counts. Thus, the record clearly conveys the intention of the jury and any discrepancy on the jury verdict form is harmless error. This assignment of error is without merit.
In Washington’s last assignment of error, he asserts that his sentences are unconstitutionally excessive because they are not appropriately tailored to him and will not further the ends of justice. He specifically points out that the trial court considered his four previous crimes of violence without | ^noting that they arose out of two, not four instances and that his mental problems will not improve with incarceration, but only with treatment.
The appellate review of sentences for' excessiveness is two-pronged. First, the record must show that the trial court considered the criteria of La.C.Cr,P. art. 894.1. A trial judge has broad discretion when imposing sentencing within the statutory limits, and the reviewing court may not overturn a sentence absént manifest abuse of discretion. State v. Smith, 01-2574 (La.1/14/03), 839 So.2d 1. The sentencing' court is not required -to list every aggravating or mitigating circumstance so long as the record reflects that it adequately considered the guidelines. State v. Smith, 433 So.2d 688 (La.1983); State v. Linder, 49,652 (La.App.2d Cir.4/8/15), 162 So.3d 1278; State v. Watson, 46, 572 (La.App.2d Cir.9/21/11), 73 So.3d 471.
The articulation of the factual basis for a sentence is the goal of La. C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Sanders, 49,241 (La.App.2d Cir.10/22/14), 151 So.3d 160, writ denied, 14-2536 (La.1/16/15), 157 So.3d 1133. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Ates, 43,327 (La.App.2d Cir.08/13/08), 989 So.2d 259, writ denied, 08-2341 (La.05/15/09), 8 So.3d 581; Sanders, supra. There is no requirement that specific matters be given any particular weight at sentencing. State v. Taves, 03-0518 (La.12/3/03), 861 So.2d 144; State v. Caldwell, 46,718 (La.App.2d Cir.11/2/11), 78 So.3d 799.
The second prong is constitutional excessiveness. A sentence violates La. Const; art. I, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is deemed grossly disproportionate if, when the crime and *361 punishment are viewed in light of the harm done to society, it shocks the -sense of justice or makes no measurable contribution to acceptable penal objectives. State v. Guzman, 99-1753 (La.5/16/00), 769 So.2d 1158.
As a general rule, maximum or near maximum sentences are reserved for the worst offenders and the worst offenses. State v. Woods, 41,420 (La.App.2d Cir.11/1/06), 942 So.2d 658; State v. Brisco, 33,179 (La.App.2d Cir.4/5/00), 756 So.2d 644, writ denied, 00-1478 (La.5/25/01), 792 So.2d 749.
For his armed robbery conviction as a second felony offender, Washington faced potential sentencing exposure of ‘between 49.5 and 198.5 years at hard labor. La. R.S. 14:64; La. R.S, 15:529.1, .For his attempted second degree murder conviction, Washington faced sentencing exposure of not less than 10 years, nor more than 50 years, without benefit of parole, probation, or suspension - of sentence. La. R.S. 14:27; La. R.S. 14:30.1.
|17The amended habitual offender bill of information filed by the state charged Washington as a second felony offender with a prior forcible rape conviction and the present armed robbery. Upon Washington’s adjudication as a second felony offender, he filed a “Statement on Sentencing and Defendant’s Response to State’s Motion for Discovery” and attached his mental health records provided by the Social Security Administration from his.incarceration from 1995-2011. The records reflect his treatment and medications for bipolar disorder and/or schizoaffective disorder, and were offered to the trial court for consideration as a mitigating circumstance. Washington also asked the court to allow his sentences to run concurrently, since they arose out of the same transaction.
On April 29, 2015, Washington was sentenced, as a second felony offender on the armed robbery conviction, to serve 55 years at hard labor without the benefit of probation, parole, or suspension of sentence. On the attempted second degree murder conviction, Washington received a sentence of 45 years at hard labor without the benefit of parole, probation or suspension of sentence. The trial court ordered the sentences to run concurrently. Washington’s motion to reconsider sentence was denied on May 1,2015.
Prior to sentencing Washington, the trial court reviewed, the sentencing guidelines in La.C.Cr.P. art. 894.1, and found the imposed sentences consistent with Washington’s criminal -history of four serious crimes of violence. The trial court also reviewed Washington’s mental health records as a mitigating circumstance, but still found him in need of |1slengthy penal custody and that lesser sentences would deprecate the seriousness of the offenses. '
In fashioning the imposed sentences, the trial court appropriately considered Washington’s criminal history and mental health diagnosis. The weight given to his mental health condition was within the discretion of the trial court. Despite Washington’s mental health history, there is no evidence that he did not understand the criminal nature of his actions. Notably, the trial court included an order for Washington to receive any needed mental health treatment.
Further, the evidence showed that both victims suffered adversely from Washington’s actions. Berry has been permanently paralyzed, needs constant care and his life expectancy has been shortened. Cooper quit her job the day of the incident and moved away from the area, not wanting her small children to be-in that environment. Washington’s criminal history now includes forcible rape, attempted second *362 degree murder; and two convictions of armed robbery. Despite spending 16 years in prison before being released in 2011,. he committed the present offenses only two years after his release. Washington has obviously failed to benefit from prior leniency in sentencing or be rehabilitated by his prior incarceration. His decision to continue his criminal behavior demonstrates a refusal to control his criminal propensities.
In these circumstances, we cannot find the imposed sentences excessive. Considering Washington’s criminal history, the seriousness of the offenses, the extent of Berry’s injuries, and Washington’s likelihood' of -1 ^rehabilitation, the sentences do not shock the sense of justice, nor are disproportionate to the severity of the offenses. This assignment of error is without merit.

Decree

For the foregoing reasons, Washington’s convictions and sentences are affirmed.
AFFIRMED.

. State's Exhibit 15, the surveillance video from the register camera between 1:03:20 p.m. and 1:03:30 p.m., shows blood dripping . from the hands of the robber.