Judgment rendered January 10, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,450-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

JENNIFER LOIS LAVERNE                       Appellant
FORD

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 376,204

Honorable Ramona Emanuel, Judge

* * * * *

LOUISIANA APPELLATE PROJECT               Counsel for Appellant
By: Douglas Lee Harville

JAMES E. STEWART, SR.                      Counsel for Appellee
District Attorney

SENAE D. HALL
REBECCA A. EDWARDS
Assistant District Attorneys

* * * * *

Before PITMAN, COX, and ROBINSON, JJ.

**PITMAN, C. J.**

A jury convicted Defendant Jennifer Lois Laverne Ford of second degree murder. The trial court sentenced her to life imprisonment without the benefit of parole, probation or suspension of sentence. Defendant appeals. For the following reasons, we affirm her conviction and sentence.

## FACTS

On September 18, 2020, the state filed an indictment charging Defendant with the second degree murder of Jasper Corneil Martin, III.

A jury trial began on June 14, 2022. Stephanie Garner, Martin's mother, testified that he and his girlfriend, Ladestaney Jackson, had a daughter named Skaii, who was born December 30, 2019. They lived two blocks from her house; but after Martin and Jackson broke up, Martin moved in with her. She stated that Martin and Jackson were both involved in Skaii's upbringing. She testified that on June 4, 2020, she received a call that Martin had been stabbed and taken to the hospital. After she arrived at the hospital, she learned that Martin, who was 20 years old, succumbed to his injuries.

Officer Sheena Morris of the Shreveport Police Department testified that at 12:56 a.m. on June 4, 2020, she was dispatched to a duplex on Henderson Avenue regarding a stabbing. She saw a woman with a baby, later identified as Jackson and Skaii, on the porch and a man, later identified as Martin, lying in the grass across the street. She described him as "lifeless" with blood on his right neck and shoulder. She observed Montral Garner ("Garner"), Martin's brother, in a panic and screaming at him to wake up. Garner told Ofc. Morris that "Jennifer," later identified as Defendant, just stabbed his brother and explained what had happened, i.e.,

that he and Martin were at their house when Martin received a call to come pick up Skaii because Jackson and Defendant "were getting into it" and Defendant was trying to take Skaii. Garner told Ofc. Morris that when he and Martin arrived at the house to get Skaii, Defendant wanted to fight Martin; Martin tried to dodge her; she retrieved two knives and began swinging them at Martin; she hit him in the right shoulder and tried to stab him again; Garner pushed Defendant; Garner and Martin left the house; and Defendant left the scene in a minivan and took the knives with her. Ofc. Morris then spoke with Jackson, who was crying hysterically. Jackson told Ofc. Morris that she had just broken up with Defendant; Defendant tried to get Skaii; Martin arrived; Jackson, Martin and Defendant began arguing; Martin told Defendant that her breakup with Jackson had nothing to do with him, he did not want to fight her and he just wanted Skaii; Defendant retrieved knives from the kitchen, charged toward Martin and hit him with a knife; Garner pushed Defendant; everyone ran outside; and Defendant left in her vehicle. Ofc. Morris testified that she did not locate any weapons at the scene, and Defendant was not present.

Chatika Arnold, Jackson's best friend, testified that after midnight on June 4, 2020, she was on the phone with Jackson, who was at home with Defendant. Arnold explained that she could hear Defendant's voice in the background of their call and that Defendant was speaking negatively about Jackson on Facebook Live. She described Jackson as "mad" and wanting Defendant to leave. She overheard Jackson ask Defendant, "Why you going back there to my baby? Why are you trying to touch my baby? My baby's asleep." This confused and concerned Arnold, so she called Garner and asked to speak to Martin and told Martin he needed to go get Skaii. She

2

noted that Jackson asked her to call them. Arnold testified that 40 to 45 minutes later, Jackson called her, was nervous and shaken up, said she did not know what to do and hung up. Jackson called her back after law enforcement arrived, and the officer asked her about Facebook Live. Arnold did not learn what happened to Martin until she saw it on the news later that morning.

Gerald Thomas of the Shreveport Police Department testified that after midnight on June 4, 2020, the 911 emergency call center received calls regarding a stabbing on Henderson Avenue. Recordings of the calls made by Coyetta Pearson and Garner were played for the jury. Pearson reported that a man was not breathing. Garner reported that his brother had been stabbed in the shoulder, was losing a lot of blood and was dying. Martin can be heard in the background of Garner's call saying Jackson's name.

Coyetta Pearson testified that she lives next door to the duplex on Henderson Avenue. She testified that at midnight on June 4, 2020, she was watching television at home when she heard women arguing at the duplex. She then heard someone screaming. She observed a man's body in the ditch and Jackson running from the ditch to the porch and heard Jackson asking for help. Pearson called 911. She identified Defendant as a frequent visitor to the duplex and that she drove a white van. Pearson noted that she did not see Defendant at the scene but did see a white van "flying" down the street.

Garner testified that around midnight on June 4, 2020, he and Martin were at their mother's house when he received a call from Arnold, who asked him to give Martin the phone. Martin told Garner that Jackson and Defendant were fighting around Skaii, so he wanted to go get his baby. Garner walked with him to Jackson's house. Law enforcement interviewed

3

him several hours after the stabbing, and a recording of the interview was played for the jury.[1]  In the interview, Garner stated that Arnold called him and told him to give the phone to Martin.  Martin began getting dressed; Garner asked what was wrong; Martin said that Defendant and Jackson were fighting, so he wanted to go get his baby; and Garner went with him.  Garner stated that Defendant asked Martin if he wanted to fight, Martin "was bucking at her . . . but was not going to hit her" and things escalated from there.  He stated that Martin got in Defendant's face but never touched her.  Defendant retrieved two large kitchen knives, swung them wildly and blindly and stabbed Martin.  Garner pushed Defendant as she was running after Martin.  Garner saw Martin's shirt drenched in blood, they left the house and Martin stumbled into the sewer and was gasping for air.  Garner called 911 while applying pressure to Martin's wound.  Garner stated that Defendant left in her van.  Garner noted that Martin and Jackson had an altercation one month prior to the stabbing.  He explained that they were arguing about the baby and noted that Defendant was present.  He stated that law enforcement were called and gave them a warning.

On cross-examination, Garner testified that Martin got in Defendant's face and showed his frustration but did not try to intimidate her.  He agreed that Martin was bigger than Defendant.  He observed Defendant stab Martin and described Martin as defending himself by dodging her.  On redirect examination, Garner confirmed that Martin did not touch Defendant.

---

[1] Garner testified that months after his brother was killed, he was shot in the head, which affects his memory.  The state, therefore, chose to introduce the recording of Garner's interview with law enforcement to present his recollection of the events.  The defense did not object.

As discussed in Defendant's second assignment of error, the entire recording of Defendant's interview was not played for the jury.  The following summary is of the entirety of the recorded interview.

Jackson testified that in early 2020, she, Martin and Skaii lived in a duplex on Henderson Avenue. She and Martin soon broke up, and he moved out. She then began dating Defendant, whom she met at work. Jackson testified that on the night of June 3 and early morning of June 4, 2020, she and Defendant got into an argument, she asked Defendant to leave and Defendant refused. Jackson called Arnold, and Defendant went on Facebook Live to talk about Jackson. She stated that Defendant went into the bedroom to pick up Skaii, and she told her to put Skaii down. Jackson and Arnold ended their call. Then Martin and Garner walked through the front door, and Martin told Jackson that Arnold called him to get Skaii. Jackson testified that Defendant asked Martin why he was there and if he wanted to fight, and Jackson told them not to fight. Jackson stated that Defendant then picked up two knives—one in each hand—and began swinging them. She noted that Defendant had hidden the knives in the living room during an argument because she thought Jackson was going to slice her tires. Jackson stated that Defendant "came after" Martin with the knives, Martin tried to dodge her and Defendant hit Martin. Jackson noted that neither Martin nor Garner was armed and that she never saw Martin strike Defendant. She stated that Martin then tried to run past Defendant and Garner pushed Defendant into a wall so Martin could go outside. Jackson went to the front porch and saw Defendant leave with the knives in her hand and drive away in her van. She also saw Martin fall in a ditch. She noted that Garner and another man applied pressure to Martin's wound and that Martin was gasping for air and screamed her name. She went to where he fell, and Martin wrapped his hands around her and told her, "I just want you all to know I love you," and then stopped talking. Jackson stated that she

"lost it" and was screaming and crying on the porch when law enforcement arrived. Jackson stated that she did not call 911 because she was in shock but that a neighbor called. She told law enforcement that Defendant stabbed Martin and then left the scene but that she did not know where Defendant went. Jackson stated that Martin was taken to the hospital, and she was told he was still breathing. Jackson then went to the detective's office to give a statement, and there she learned that Martin died.

On cross-examination, Jackson stated that when Martin visited on other occasions, he knocked before entering, but on the night of these events, he entered without knocking. She did not recall Martin threatening Defendant or punching his hand into his fist. She clarified that when Defendant asked Martin if he wanted to fight, she was not trying to pick a fight and was "just asking"; that Martin "did say yeah" while Jackson was saying they would not fight; and that Defendant said "Yeah, we is."

Adams testified that in 2020 she lived in a duplex on Henderson Avenue, next door to Jackson and her baby. She stated that on the night of June 3 and early morning hours of June 4, 2020, she was asleep when she heard a lot of noise and Jackson scream. Adams looked out of the window and saw someone bleeding and fall into a ditch. She also saw Defendant walk to her van while waving knives and then drive away. Adams then opened the door and saw Jackson on the porch. Jackson said, "She stabbed him." Adams walked to Martin and saw Garner remove his shirt and put it over the wound. She recalled that Martin's legs were kicking, so she tried to hold his legs. She then retrieved a bath towel from her house to help apply pressure. She noted that there was a lot of blood. She heard Martin call for Jackson and Skaii and say how much he loved them. She noted that Martin

6

was able to talk for a few minutes and then his eyes rolled back in his head and he stopped breathing.

Detective Jason Saiz of the Shreveport Police Department testified that on June 4, 2020, he investigated a stabbing on Henderson Avenue. He first went to the hospital where he learned the victim was deceased. He then went to the scene where he saw drops of blood leading from the road into the house, including a bedroom where there were blood drops and smears on the wall. He then went to his office to conduct interviews of Garner and Jackson. He stated that Garner and Jackson identified Defendant in photographic lineups. Around 2:00 or 3:00 a.m. on June 4, 2020, he learned that Defendant called and said she had been assaulted at a house on Henderson Avenue by a male who was stabbed earlier that night. At approximately 7:00 a.m., he came into contact with Defendant, who told him that she was injured during a scuffle with Martin. He took photographs of Defendant and noted that there was some dried blood on her clothing and fingers and that her only injury was a cut on her finger.

Dr. Long Jin, a forensic pathologist, testified that he performed an autopsy on Martin on June 4, 2020. He determined that the cause of death was a fatal stab wound. He described a "big and deep" stab wound, i.e., six centimeters deep and two centimeters wide, to the right subclavian area. He explained that it was fatal because it cut the right external jugular vein and right subclavian vein and perforated the right lung. He noted that it caused a lot of hemorrhaging and that he found 700 ccs of blood in the right pleural cavity. He stated that he also observed multiple incised wounds to Martin's right upper arm and chest. He described the difference between a stab wound and an incised wound, stating that an incised wound is a cut or

superficial slash that is not deep like a stab wound.  He stated that the manner of death was homicide.  He did not note any defensive wounds.

On June 16, 2022, the jury found Defendant guilty as charged of second degree murder.

On June 23, 2022, Defendant filed a motion for new trial.  At a hearing on June 28, 2022, the trial court denied the motion for new trial and sentenced Defendant to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.

Defendant appeals.

## DISCUSSION

*Sufficiency of the Evidence*

In her first assignment of error, Defendant argues that the state failed to prove beyond a reasonable doubt that she did not act in self-defense and that she was guilty of second degree murder.  She contends that she acted in self-defense when Martin wanted to fight her after he entered the house in the middle of the night as an uninvited guest to take the baby without Jackson's consent.  She states that Martin was not a helpless victim and that the state offered no evidence as to how she could have inflicted a wound to Martin's neck unless he was bent over to attack her.  She contends that it was reasonable for her to assume she would suffer great bodily harm in a fight against a man who is a foot taller than her and for her to arm herself.

The state argues that it presented sufficient evidence to prove beyond a reasonable doubt that Defendant committed second degree murder and did not act in self-defense.  It contends that the evidence shows that Defendant was the aggressor, challenged Martin to a fight and armed herself with two knives.

8

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Hearold*, 603 So. 2d 731 (La. 1992); *State v. Smith*, 47,983 (La. App. 2 Cir. 5/15/13), 116 So. 3d 884. *See also* La. C. Cr. P. art. 821. The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442.

When a defendant challenges the sufficiency of the evidence in a self-defense case involving a homicide, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Jackson*, 54,124 (La. App. 2 Cir. 1/12/22), 332 So. 3d 792, *writ denied*, 22-00298 (La. 4/12/22), 336 So. 3d 90. In the case *sub judice*, the jury was instructed, pursuant to La. R.S. 14:20(A)(1) and (2), that a homicide is justifiable:

> (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
> (2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger

to his own life or person if he attempted to prevent the felony without the killing.

A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21.

La. R.S. 14:30.1(A)(1) defines second degree murder as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. Specific criminal intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10. Specific intent need not be proven as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. *State v. Graham*, 420 So. 2d 1126 (La. 1982). Specific intent may be inferred from the extent and severity of the victim's injuries and the defendant's use of a deadly weapon to produce those injuries. *State v. Washington*, 50,424 (La. App. 2 Cir. 3/16/16), 188 So. 3d 350, *writ denied*, 16-0718 (La. 4/13/17), 218 So. 3d 119. Louisiana courts have found sufficient evidence to prove that a defendant had the requisite specific intent from the number and nature of the victim's stab wounds. *State v. Mackens*, 35,350 (La. App. 2 Cir. 12/28/01), 803 So. 2d 454, *writ denied*, 02-0413 (La. 1/24/03), 836 So. 2d 37, *citing State v. Bates*, 95-1513 (La. App. 1 Cir. 11/8/96), 683 So. 2d 1370.

Viewing the evidence in the light most favorable to the prosecution, the state proved beyond a reasonable doubt that Defendant did not commit the homicide of Martin in self-defense. The testimony of Jackson and

10

Garner and their statements to law enforcement demonstrate that Defendant was the aggressor and that the homicide was not justifiable. They both stated that when Martin arrived at the duplex to pick up Skaii, Defendant asked him if he wanted to fight, she armed herself with two knives and swung them at Martin, Martin tried to dodge her, she stabbed Martin and Garner pushed her out of the way so Martin could escape. Jackson and Garner both noted that Martin never touched Defendant, Det. Saiz testified that Defendant had no injuries except a cut on her finger and Dr. Jin stated that he did not discover any defensive wounds on Martin's body during the autopsy. As the armed aggressor who challenged Martin to a fight, Defendant did not believe she was in imminent danger of losing her life or receiving great bodily harm, and she did not stab Martin for the purpose of preventing a violent or forcible felony. She brought about the difficulty in this case and did not withdraw from the conflict. She escalated the initial conflict of challenging Martin to a fight by arming herself with two knives and attacking Martin, who was unarmed.

The state also proved beyond a reasonable doubt that Defendant had the specific intent to kill or inflict great bodily harm upon Martin. Defendant armed herself with two knives that she had hidden in the living room and swung them at Martin during an argument that she initiated. Dr. Jin noted multiple incised wounds, i.e., superficial cuts and slashes, to Martin's right upper arm and chest in addition to the fatal stab wound to the right subclavian area. Defendant's actions of challenging Martin to a fight, arming herself with two dangerous weapons and swinging them at Martin to cause multiple superficial wounds and a fatal stab wound demonstrate her specific intent to kill or inflict great bodily harm upon Martin.

11

Accordingly, this assignment of error lacks merit.

*Record on Appeal*

In her second assignment of error, Defendant argues that the state failed to create a full record for this court on appeal. She explains that when playing the recording of Garner's statement, the state failed to make a record of what portions of his statement were shown to the jury. She contends that she cannot argue how the state failed to carry its burden of proof because she cannot inform this court of what evidence was presented to the jury.

The state argues that it did not deprive Defendant of her right to a complete record based on the prosecutor not specifying what parts of Garner's interview were played for the jury. It states that because the entire recording is in evidence, the record is not incomplete. It notes that defense counsel did not object to the interview or any part of the interview being played for the jury and, therefore, waived this argument on appeal.

No person shall be subjected to imprisonment without the right of judicial review based upon a complete record of all evidence upon which the judgment is based. La. Const. art. I, § 19. This right may be intelligently waived. *Id.* In felony cases, the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel. La. C. Cr. P. art. 843.

An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La. C. Cr. P. art. 841(A). It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to

take, or of his objections to the action of the court, and the grounds therefor. *Id.* If no objection is made in the trial court, any error committed therein is not preserved for appellate review. *State v. Lloyd*, 48,914 (La. App. 2 Cir. 1/14/15), 161 So. 3d 879, *writ denied*, 15-0307 (La. 11/30/15), 184 So. 3d 33.

Defense counsel did not make a contemporaneous objection at trial to the introduction of the recording of Garner's interview with law enforcement or to the state's failure to state on the record what portions of the recording were played for the jury. Therefore, this argument was not preserved for appellate review. We note that the record before this court on appeal is a complete record and includes everything required by La. C. Cr. P. art. 843.

Accordingly, this assignment of error lacks merit.

## CONCLUSION

For the foregoing reasons, we affirm Defendant Jennifer Lois Laverne Ford's conviction and sentence.

**AFFIRMED**.