Judgment rendered May 20, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,829-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                     Appellee

versus

NOEL DEON GARNER                       Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 387,323

Honorable Donald E. Hathaway, Jr., Judge

* * * * *

LOUISIANA APPEALS AND WRIT          Counsel for Appellant
SERVICE
By: Remy V. Starns
    Justin Caine Harrell


JAMES E. STEWART, SR.               Counsel for Appellee
District Attorney


CRISTOPHER BOWMAN
JASON W. WALTMAN
ERIC M. WHITEHEAD
Assistant District Attorneys

* * * * *

Before PITMAN, THOMPSON, and MARCOTTE, JJ.

**PITMAN, C. J.**

The jury convicted Defendant Noel Deon Garner of second degree murder. The trial court sentenced him to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant appeals his conviction. For the following reasons, we affirm his conviction and sentence.

**FACTS**

On May 26, 2022, the grand jury filed an indictment charging Defendant with one count of second degree murder. It alleged that on or about January 20, 2022, Defendant committed the second degree murder of Jermond Lamar Houston. Defendant entered a plea of not guilty.

A jury trial began on April 22, 2025. Jacqueline Lee testified that on the night of January 19, 2022, and into the early morning of January 20, 2022, she was working as a cashier at the Shell station on West 70th Street in Shreveport. The store was equipped with security cameras; Lee identified video recordings taken from those cameras on January 19 and 20, 2022, and the jury viewed that footage.[1] Lee testified that Houston was armed when he

---

[1] The security camera footage from the exterior of the Shell station shows Houston walk inside at 11:50 p.m. on January 19, 2022; the magazine of the firearm in his right pants pocket is visible. A white Grand Marquis arrived outside the store at 11:51, and Defendant exited from the front passenger seat at 11:52 and entered the store. At 11:53, Houston exited the store while speaking on his cellphone and also spoke to other customers outside the store. He reentered the store at 11:55. At 11:58, both Defendant and Houston exited the store—Defendant walked to the vehicle and sat in the front passenger seat while Houston walked in the opposite direction. Houston reentered the store at 11:59, and Defendant exited the vehicle at 11:59 and reentered the store at 12:00 a.m. Seconds later the glass door to the store shattered and Houston fell with his upper body outside and his lower body inside. Defendant exited the store and stood over Houston while shooting him. Houston kicked his legs in the air and moved his body inside. Defendant then walked to the vehicle, and it drove away. These events all happened before 12:01 a.m. on January 20, 2022. A first responder arrived at 12:06 a.m.

The security camera footage from the cash register area of the Shell station shows Defendant and Houston entering and exiting the store at the same times shown in the footage from the exterior camera. At 11:55 p.m., Defendant was holding an ICEE cup.

entered the store. She stated that prior to the shooting, no one in the store was arguing, shouting or fussing. She identified Defendant in the courtroom as the person who shot Houston.

Khiry Fuller testified that on the night of January 19, 2022, he was at the Shell station on West 70th Street.[2] He viewed a portion of the security camera footage and identified his vehicle as a white Grand Marquis, himself as the person in the driver's seat and Defendant as the passenger exiting the vehicle. He stated that Defendant was not injured when they arrived at the Shell station but that he was injured when they left the scene.[3] Fuller testified that he never went inside the store and did not see Houston on the outside of the store.

Cpl. Matthew Dixon of the Shreveport Police Department testified that on January 20, 2022, he responded to a call of a shooting at the Shell station on West 70th Street. When he arrived on the scene, he observed a black male lying on the ground and bleeding. He stated that officers cleared

---

At 11:58, Defendant and Houston spoke to each other. At 11:59, Houston was purchasing a Powerade at the cash register when, at 12:00 a.m., Defendant walked up behind him, took the firearm from Houston's pocket, pointed the firearm at Houston and began shooting at Houston as Houston attempted to exit the store.

The security camera footage from the interior of the Shell station shows Defendant and Houston entering and exiting the store at the same times shown in the footage from the other cameras. Defendant and Houston spoke to each other for a few seconds between 11:57 and 11:58 p.m. At 11:59, Houston was standing at the cash register when Defendant reentered the store at 12:00 a.m., walked up behind him, grabbed the firearm from Houston's pocket, pointed the firearm at Houston and began shooting him. Defendant walked over Houston's body and continued shooting him as he (Defendant) exited the store.

[2] Fuller also testified about his criminal history, which included a 2014 conviction for possession of marijuana, second offense; a 2017 conviction for possession of a Schedule II, methamphetamine; and a 2024 guilty plea for possession of a firearm by a convicted felon for which he was currently serving a five-year sentence. He noted that part of his plea agreement was that he would testify truthfully in this case.

[3] The record suggests that Defendant shot himself in the foot as he was shooting Houston.

the scene, roped off the area with caution tape and placed witnesses in separate vehicles.

Cpl. Christopher Collins, a crime scene investigator with the Shreveport Police Department, testified that he was called to the scene of a homicide on January 20, 2022. His photographs of the scene were published to the jury as he described them. He also testified about evidence collected from the scene, including 18 expended 9-millimeter cartridge casings and an ICEE cup from which he lifted a latent fingerprint. He stated that he went to the hospital to document the decedent, and those photographs were published to the jury. He noted that hospital staff attempted lifesaving measures on Houston and that projectiles were recovered during those measures. He also photographed and collected evidence from the Grand Marquis, which law enforcement recovered and impounded. These photographs were published to the jury, and Cpl. Collins identified suspected blood on and inside the vehicle, i.e., on the trunk and the front passenger seat and floorboard, and where he lifted latent prints. He stated that he took swabs of the suspected blood to submit to the crime lab for DNA analysis and noted that he was not able to find any usable prints on the vehicle. After Defendant's arrest, Cpl. Collins searched his residence. Photographs of this search were published to the jury, and Cpl. Collins noted that he seized bloody gauze, a .40-caliber Glock pistol and a Hi-Point 9-millimeter pistol. He stated that he swabbed the firearms for DNA testing.

Det. Adam McEntee of the Shreveport Police Department testified that he was advised of a shooting at the Shell station on West 70th Street, that a male had been struck multiple times and that he was being transported to the hospital with life-threatening injuries. While on his way to the Shell

3

station, Det. McEntee learned that Houston succumbed to his injuries, so he redirected to the hospital. During his investigation, Det. McEntee interviewed Houston's cousin who was present during the shooting and learned that Defendant fled the scene in either a Mercury Grand Marquis or a Ford Crown Victoria. He also interviewed Jacqueline Lee, who stated that the vehicle was frequently at the Shell station. He then searched for and found the vehicle. At trial, Det. McEntee viewed the security camera footage and described what he was viewing to the jury. He stated that Defendant walked into the store and stood in line behind Houston, who had a long magazine in his pocket. Defendant grabbed the magazine, removed it from Houston's right pants pocket and raised and pointed the firearm at Houston. Houston then removed a firearm from his left pocket and began walking toward the exit door when Defendant started shooting. Houston fell to the ground and the firearm he was holding fell to his right side. Det. McEntee noted that Houston was attempting to flee and that he never pointed a firearm at Defendant.

Cpl. Tiffany Oliver of the Shreveport Police Department testified that on January 27, 2022, she was dispatched for a warrant execution. Another officer took Defendant into custody, and she transported him to a rally point and then to the detective's office. She stated that when she took custody of Defendant, she Mirandized him and he then made post-Miranda statements.[4] He told her that "Old Boy shot him in the foot," that he (Defendant) did not have a firearm and that he (Defendant) grabbed Houston's firearm and shot him. Defendant explained to Cpl. Oliver that Houston had "been going

_____

[4] Cpl. Oliver stated that she was wearing a body camera and her vehicle was equipped with a dashboard camera but that the recordings from that day were not saved.

around saying what he was going to do to me." She noted that Defendant had a limp.

Long Jin, M.D., who was accepted as an expert in the field of forensic pathology, testified that he performed the autopsy of Houston. Photographs taken by Dr. Jin during the autopsy were published to the jury, and he discussed the injuries shown in the photographs. Dr. Jin testified that Houston sustained 26 gunshot wounds and clarified that an entrance and exit wound are considered one wound because they were caused by one bullet. He determined that the manner of death was homicide, and the cause of death was multiple gunshot wounds.

Sgt. John Madjerick of the Shreveport Police Department was accepted as an expert in the field of latent print examination and identification. He testified that he compared the latent print lifted from the ICEE cup with Defendant's fingerprints and determined that Defendant left the latent print.

Michael Stelly of the North Louisiana Crime Lab was accepted as an expert in the field of forensic firearm examination. He testified that he examined the firearms evidence in this case. He analyzed 18 cartridge cases and determined that they were fired from the same 9-millimeter weapon. He analyzed six 9-millimeter bullets and determined that they had the same class characteristics but were too damaged to conclude that they were from the same weapon. He excluded the .40-caliber Glock pistol as the weapon that fired the bullets and explained that 9-millimeter ammunition cannot be fired from a .40-caliber weapon. He analyzed the 9-millimeter Hi-Point pistol and determined that the shell casings did not contain the class

characteristics of a Hi-Point, which eliminated it as the firearm used to shoot Houston.

Kari Dicken of the North Louisiana Crime Lab was accepted as an expert in the field of forensic DNA analysis. She testified that she compared Defendant's DNA to evidence and determined that the suspected blood from the piece of gauze and from swabs of the Grand Marquis's front passenger seat, trunk and passenger seat floorboard were all consistent with Defendant's DNA profile.

Adlean Houston, the victim's grandmother, testified that he had three children, ages seven, six and three. She stated that she missed her grandson and did not understand why he was killed.

On April 23, 2025, the jury found Defendant guilty as charged of second degree murder.

On April 28, 2025, Defendant filed a motion for post-verdict judgment of acquittal and a motion for new trial. The trial court denied both motions.

A sentencing hearing was held on June 12, 2025. The trial court determined that the sentence mandated by statute was appropriate in this case and sentenced Defendant to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.

On July 2, 2025, Defendant filed a motion to reconsider sentence, which the trial court denied.

Defendant appeals his conviction.

## DISCUSSION

In his sole assignment of error, Defendant argues the evidence was insufficient to establish his guilt of second degree murder and that the state

failed to prove beyond a reasonable doubt that he did not act in self-defense when he shot Houston. He contends that he saw a semi-automatic handgun with an extended 30-round magazine "blatantly protruding" from the right pocket of Houston's pants, that he attempted to disarm Houston, that Houston brandished a second firearm and that he (Defendant) only fired in response thereto. Defendant alleges that Houston previously threatened him. He contends that he did not open fire until after Houston armed himself with the second weapon, which shows that he acted out of fear for his safety and not with malicious intent. He argues that these facts compel the finding of justifiable homicide and that the state failed to rebut his claims of self-defense. In the alternative, Defendant argues that, at most, the evidence establishes manslaughter as he acted in sudden passion or heat of blood immediately provoked by Houston's threatening conduct.

The state argues that Defendant committed the second degree murder of Houston when he intentionally shot him numerous times at close range. It states that as the sole aggressor, Defendant has no right to claim self-defense. It alleges that Defendant grabbed the firearm from Houston's pocket and immediately pointed it at Houston, who had nothing in his hands. It states that Houston turned toward the exit and reached his hand into his other pocket to remove a firearm when Defendant began shooting. It notes that Defendant stood over Houston and continued shooting and that Houston sustained 26 gunshot wounds. The state argues that Defendant did not testify; and, therefore, the record does not contain any evidence regarding Defendant's belief or mental state. In the alternative, the state argues that Defendant failed to meet his burden of proving the mitigatory factors to warrant a manslaughter conviction.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Hearold*, 603 So. 2d 731 (La. 1992); *State v. Smith*, 47,983 (La. App. 2 Cir. 5/15/13), 116 So. 3d 884. *See also* La. C. Cr. P. art. 821. The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442.

In any criminal proceeding in which the justification of self-defense is raised pursuant to La. R.S. 14:19 or 20, the state shall have the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense. La. C. Cr. P. art. 390. In the case *sub judice*, the jury was instructed, pursuant to La. R.S. 14:20(A)(1), that a homicide is justifiable if committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21.

La. R.S. 14:30.1(A)(1) defines second degree murder as the killing of a human being when the offender has a specific intent to kill or to inflict

great bodily harm. Specific criminal intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10. Specific intent need not be proven as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. *State v. Graham*, 420 So. 2d 1126 (La. 1982). Specific intent may be inferred from the extent and severity of the victim's injuries and the defendant's use of a deadly weapon to produce those injuries. *State v. Washington*, 50,424 (La. App. 2 Cir. 3/16/16), 188 So. 3d 350, *writ denied*, 16-0718 (La. 4/13/17), 218 So. 3d 119.

> La. R.S. 14:31(A)(1) states that manslaughter is:

> A homicide which would be murder under . . . Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

"Sudden passion" and "heat of blood" are not elements of the offense of manslaughter. *State v. Lombard*, 486 So. 2d 106 (La. 1986). Rather, they are mitigatory factors in the nature of a defense that exhibit a degree of culpability less than that present when homicide is committed without them. *Id*. In reviewing a defendant's claim, the court must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. *Id*.

In this case, the stated proved beyond a reasonable doubt that Defendant did not act in self-defense when he shot and killed Houston. The

jury viewed the security camera footage from the Shell station and observed Defendant and Houston in the minutes leading up to the shooting. Their only interaction was a brief conversation while standing inside the store, and the store clerk testified that they were not arguing. The security camera footage confirms that Defendant was the aggressor in this case. The two views from inside the store show Houston standing at the cash register and Defendant walking up behind him, taking the firearm from his pocket, pointing it at him and shooting him multiple times as he attempted to flee. Although Defendant contends that he did not open fire until after Houston armed himself with a second weapon, the security camera footage is inconsistent with this allegation. It shows Defendant removing the first firearm from Houston's pocket and firing it before Houston reached for his other firearm while moving to exit the store. It also disproves Defendant's statement to Cpl. Oliver that Houston shot him in the foot—Houston never raised or fired the firearm in his hand. Rather, Defendant shot himself as he shot multiple rounds at Houston. Defendant was clearly the aggressor and did not withdraw; therefore, this homicide was not justifiable.

The state proved beyond a reasonable doubt that Defendant had the specific intent to kill or inflict great bodily harm upon Houston. His specific intent is inferred from the extent and severity of Houston injuries—i.e., 26 gunshot wounds—and that Defendant used a firearm with an extended magazine to produce those injuries. Defendant's specific intent is further demonstrated by his action of standing over Houston and continuing to shoot him as he lay on the ground. Further, the evidence presented at trial does not demonstrate that Defendant acted in sudden passion or heat of blood and therefore does not support a verdict of manslaughter.

10

Accordingly, this assignment of error lacks merit.

## CONCLUSION

For the foregoing reasons, we affirm the conviction and sentence of Defendant Noel Deon Garner.

**AFFIRMED.**